**UNITED STATES of America, ex rel. Barbara JONES, Petitioner,**

v.

**Warden Odie WASHINGTON of the Dixon Correctional Center and Roland W. Burris, Attorney General of the State of Illinois, Respondents.**

No. 92 C 7588.

United States District Court, N.D. Illinois, E.D.

Sept. 10, 1993.

Barbara Jones, pro se.

Michael Marc Glick, Illinois Atty. Gen.'s Office, Chicago, IL, for Odie Washington.

Terence Madsen, Illinois Atty. Gen.'s Office, Chicago, IL, for Roland Burris.

### MEMORANDUM AND ORDER

MORAN, Chief Judge.

On October 10, 1986, a Cook County Circuit Court judge found petitioner Barbara Jones (Jones) guilty of murder and concealment of a homicide. Jones was sentenced to concurrent prison terms of thirty-four years for murder and five years for concealment of a homicide. On appeal to the Illinois state courts Jones argued that there was insufficient evidence to convict her, that she was denied effective assistance of counsel, and that her sentence was excessive. The Illinois courts have denied Jones' appeal. Before this court is Jones' petition for writ of *habeas corpus*. She contends that she was convicted on insufficient evidence, in violation of due process of law, and was denied effective assistance of counsel, in violation of the Sixth Amendment. In addition, petitioner requests an evidentiary hearing under 28 U.S.C. § 2254(d). For the following reasons we deny Jones' writ of *habeas corpus* and her request for a federal evidentiary hearing.

### FACTS

The facts below have been taken, for the most part, from the Illinois Appellate Court's August 9, 1988 opinion. The findings of fact made by that court are supported by the record and are entitled to a presumption of correctness in this court.

On July 7, 1984, Jones, then 19 years old, gave birth to an eight-pound baby boy in the bathroom of her mother's apartment. Shortly after giving birth Jones placed the baby in a plastic bag and dropped the bag out of a window and down the airshaft. The baby died from multiple injuries suffered in the fall.

Jones denied being pregnant to Steven Zambello, the paramedic who arrived at the apartment on July 7, 1984, and to the doctor

at the hospital. Jones told the doctor and the paramedic that she had passed a large blood clot.

Detective Richard Schak spoke with Jones in the emergency room and at that time Jones told him that she had passed a large blood clot which she wrapped in newspaper. After speaking with Jones, Schak searched Jones' apartment. In the apartment Schak found bloody newspaper in the trash. He retrieved a plastic bag from the airshaft (located below the kitchen window) and found the body of a baby boy inside the bag. Schak then returned to the hospital and told Jones that he had found the baby in the airshaft. At that time Jones admitted that she had given birth to a baby in the bathroom. Schak testified that Jones told him that the baby had not moved and that she threw him out the window because she thought he was dead.

At trial, Dr. Rosalyn Tiu–Tanedo, a resident in psychiatry at the hospital, testified that she examined Jones on July 7, 1984. Dr. Tiu–Tanedo stated that Jones told her that she was six months pregnant and that earlier that day she had passed several blood clots which she threw away. The doctor further testified that Jones was alert, well-oriented and not psychotic.

It was stipulated at trial that Dr. Christopher Kubik would testify that Jones told him (at approximately 2:20 a.m. on the morning of July 8, 1984) that she gave birth in the bathroom, that she was scared by the amount of blood, and that she wrapped the baby in newspaper and threw it out the window.

Robert Maxson of the Department of Children and Family Services (DCFS) testified that he interviewed Jones on the morning of July 8, 1984, and that Jones told him that she had passed a number of small blood clots the previous day and that she wrapped them in newspaper, placed them in a bag and threw the bag out the window. Jones further told Maxson that she knew nothing about a baby at that time, and stated that she did not learn of the baby until the police told her when she was at the hospital.

Assistant State's Attorney Kim Kardas gave similar testimony at the trial. Kardas stated that when he interviewed Jones on July 8, 1984, Jones told him that when she looked into the toilet she saw a "bloody mess," which she removed from the toilet, placed in a bag and threw out the window. Jones told Kardas that she did not recognize the object she threw away to be a baby. When Kardas informed Jones that he had learned from the medical examiner that she had had an eight-pound baby boy, Jones admitted that she knew she had given birth to a baby. Jones told Kardas that she first learned she was pregnant in November 1983, but never returned to the doctor for prenatal care and never told anyone about her pregnancy.

In describing the events of July 7, 1984, Jones told Kardas that earlier in the day she began experiencing stomach pains similar to pains that she had experienced when in labor with her first child. Jones stated that while she was in the bathroom her water broke and the baby fell into the toilet. She further stated that the baby was clean, that she recognized it as a baby, and that she took the baby out of the toilet and held it in her arms. Jones told Kardas that she thought the baby was stillborn, but stated that she did not check the baby's heartbeat or pulse and did not check to see if the baby was breathing. Jones held the baby for approximately ten minutes and then wrapped the baby in newspaper, placed him in a bag, and threw the bag out the window.

Dr. Yuksel Konacki performed the autopsy on the baby. He testified that the baby's death was caused by multiple head and body injuries. Based upon the doctor's observations of the baby's lungs, he determined that the baby was born alive and breathing. Dr. Konacki stated that there were no obstructions in the baby's respiratory tract, that his skin tone was normal and he appeared to be a full-term, normal baby. Dr. Uwe Freese, chairman of the Department of Obstetrics and Gynecology at Cook County Hospital, and an expert in the area of the pathology of newborns, reviewed the records in this case and gave similar testimony to that of Dr. Konacki.

The trial court found that Jones had been proven guilty beyond a reasonable doubt.

Subsequently, Jones filed a motion for acquittal notwithstanding the court's previous finding of guilt and a motion for the reopening of proofs. The first motion alleged that Jones' conviction for murder should be vacated. The second motion alleged that the proofs should be reopened to include an affidavit by Dr. Konacki and a statement by Dr. Andrew Griffen. In the affidavit, Dr. Konacki stated that a lacerated umbilical cord could cause a loss of blood, resulting in shock, and that shock could cause a newborn to have shallow respirations and to be cold and clammy to the touch. Dr. Griffen stated that the appearance of Jones' baby could have been that of a dead infant, and that Jones might have suffered a judgment lapse brought on by the normal stress of delivery. After hearing arguments, the court denied Jones' first motion, stating that it did not find the caselaw that Jones relied on to be dispositive and that it believed that the state had proven Jones' guilt beyond a reasonable doubt. The court further listened to arguments in which Jones' attorneys claimed that the evidence concerning the possible effects of a torn umbilical cord was unavailable prior to trial, and denied Jones' motion to reopen the proofs to include the statements of Drs. Konacki and Griffen. At the close of the hearing, Jones requested and was granted a new attorney.

Subsequently, Jones' new attorney filed a motion for a new trial in which he alleged that Jones had been ineffectively represented at trial. Prior to the hearing on that motion the state presented a sworn statement by Dr. Freese, in which he stated that the pictures of Jones' baby showed that the baby was not in shock from blood loss and that the hemorrhages from the injuries suffered in the fall indicated the presence of a large amount of blood in the baby's vascular system. In that statement Dr. Freese repeated his trial testimony and stated that the baby's vigorous respirations would have led to closure of the vessel leading to the umbilical cord, making it impossible for blood to be lost through the cord. Dr. Freese also stated that he informed Jones' trial attorneys of these facts

prior to trial. The trial court denied Jones' motion for a new trial and sentenced Jones to thirty-four years in prison for murder and five years for concealment of a homicidal death.

Jones appealed the trial court's decision. In her appeal Jones argued that her conviction should be reversed because the state failed to present evidence sufficient to establish the requisite mental state necessary to sustain a conviction for murder. In addition, Jones argued that she was ineffectively represented at her trial. Further, Jones argued that she was not proven guilty of concealment of a homicide because the state failed to establish that she committed an affirmative act of concealment after the baby's death. Finally, Jones argued that her 34-year sentence was excessive. The Illinois Appellate Court affirmed the trial court's decision and held that (1) there was sufficient evidence to demonstrate that defendant acted intentionally when she performed the act that resulted in her baby's death; (2) Jones did not receive ineffective assistance of counsel; (3) Jones was properly convicted of concealment of a homicidal death; and (4) there was no abuse of discretion in the trial court's sentencing decision.

The petition before us now is Jones' first petition for writ of *habeas corpus* in the federal court. In her petition Jones argues that she was convicted on insufficient evidence and was denied effective assistance of counsel. She further maintains that she is entitled to an evidentiary hearing because "the state courts' factual determination of petitioner's guilt of first degree murder was clearly erroneous, because the state courts' determination that [petitioner] was not denied effective assistance of counsel was clearly erroneous, and the state court factual determination is not fairly supported by the record as a whole."

## DISCUSSION

### A. The Illinois Criminal Code

 Under the Illinois Criminal Code [1] a person is guilty of murder if that person

---

1. All references to the Illinois Criminal Code in this opinion are to the Code as it read on the date of the acts at issue.

kills another "without lawful justification" and either intends to cause death or great bodily harm, or knows that such acts will cause death; or knows that such acts create a strong probability of death or great bodily harm to that individual. Ill.Ann.Stat. ch. 38, § 9–1 (1985) (now 720 ILCS 5/9–1). A person is guilty of murder even if he or she did not intend to cause death or great bodily harm, if the person knows that the acts will result in one of those outcomes. *Id.* at § 9–1(a). Under Illinois law it is unnecessary to show that an accused deliberately formed an intent to kill; rather, it is sufficient to imply intent to murder by showing that the accused voluntarily and wilfully committed an act, the direct and natural tendency of which was to destroy another's life. *Id.* at (a)(2); *People v. Johnson,* 66 Ill.App.3d 84, 22 Ill.Dec. 840, 846, 383 N.E.2d 648, 654 (1978). The mental state necessary for a murder conviction is that the accused must have had the knowledge or the intent that the acts performed created a strong possibility of causing death or great bodily harm. *Id.* at 847, 383 N.E.2d at 655.

## B. Whether There was Sufficient Evidence to Support Petitioner's Murder Conviction

■ This court is governed by an extremely narrow standard of review in examining Jones' claim that the state's evidence failed to establish her guilt beyond a reasonable doubt. The question is whether, after reviewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found from the evidence and inferences drawn therefrom that the petitioner (Barbara Jones) was guilty of murder beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781,

2789, 61 L.Ed.2d 560 (1979); *United States v. Muehlbauer,* 892 F.2d 664, 666 (7th Cir. 1990). If so, the conviction must be sustained.

■ Jones argues that the record contains no evidence to establish the requisite mental state necessary to sustain a conviction for murder. She maintains that the state's evidence did not contradict her position that she thought the baby was dead at the time of delivery. After reviewing the transcript of the trial proceedings, this court cannot conclude that no rational trier of fact would have found that Jones acted intentionally when she performed the acts that resulted in her baby's death. The state produced evidence demonstrating that she kept her pregnancy a secret, received no prenatal care and, although she realized she was in labor, did not go to the hospital to have the baby. The state's evidence showed that Jones stated that she had passed a large blood clot and that she repeatedly denied delivering a baby until Schak informed her that he found her baby boy in the airshaft. The state presented medical witnesses who testified that the baby was born alive and healthy. The doctor who performed the autopsy testified that, based on his observation of the baby's lungs, there was vigorous and sustained respiratory activity on the part of the baby. In addition, Kardas testified that Jones told him that she held her baby for ten minutes before she threw him out the window. Jones stated that the baby did not move and she thought it was dead; however, during that ten-minute period she did not check to see if the baby had a heartbeat, pulse, or if the baby was breathing.[2] The requisite mental state can be sufficiently inferred from the circumstances surrounding the birth of Jones' baby, as established by the state's evidence.[3]

**2.** We further point out that this court does not find that the evidence which was unavailable prior to trial (consisting of statements by Drs. Konacki and Griffen) refutes the state's evidence. That evidence was presented by stipulation to the trial court after Jones had filed a motion for a new trial. After the doctors' statements were presented, the trial court stated that the stipulations would not affect the outcome of the matter, that the evidence would not qualify as newly discovered evidence and, therefore, denied the motion for new trial. It is not this court's role to question the trial court's decision so long as any

rational trier of fact could have made such a decision based on the evidence presented. The trial court's decision on that matter stands.

**3.** In this petition Jones refers this court to several cases which she maintains illustrate that in a case of neonatal homicide, a conviction for murder cannot stand in the absence of any evidence of defendant's mental state at the time of the death. *See e.g. People v. S.C.,* 137 Ill.App.3d 1157, 101 Ill.Dec. 810, 499 N.E.2d 177 (1985); *People v. Perry,* 147 Ill.App.3d 272, 101 Ill.Dec.

## C. Whether Petitioner was Denied Effective Assistance of Counsel

■ In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth a two-prong test for determining ineffective assistance of counsel. First, the defendant must demonstrate that his or her counsel's performance was deficient. *Id.* at 687, 104 S.Ct. at 2064. For his or her counsel's performance to be deficient the defendant must show that the attorney's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Second, the defendant must show that the deficient performance prejudiced the defense and deprived him or her of a "trial whose result is reliable." *Id.* The burden of proof falls on the petitioner to demonstrate, by a preponderance of evidence, that his counsel was ineffective. *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992), *cert. denied*, — U.S. —, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993).

Jones argues that her trial counsel was ineffective for failing to properly cross examine state witnesses, and for failing to present available expert testimony. Jones raised her ineffective assistance of counsel claim to the trial court in her motion for a new trial (the trial court denied that motion) and again made the argument that she was ineffectively represented before the Illinois Appellate Court. The Illinois Appellate Court held that Jones did not receive ineffective assistance of counsel since the decisions made by Jones' counsel were a matter of trial strategy and were not conduct falling outside the wide range of professionally competent assistance. We agree.

Jones contends that her trial counsel failed to properly cross examine the state's witnesses regarding issues that were central to her defense. In particular, Jones argues that her trial counsel failed to explore with Dr. Konacki and Dr. Freese the effect of the torn umbilical cord on the appearance of the baby. In addition, Jones argues that it was ineffective for her trial counsel to fail to interview and call as a witness Dr. Griffin, who in post-trial statements stated that the baby could have bled through the umbilical cord and that an infant in that condition could appear dead to an untrained observer. For several reasons, petitioner's arguments are not persuasive.

First, though, we need to retrace our steps somewhat to put in perspective what was before the trial court when Dr. Konacki testified at trial about the condition of the umbilical cord and the considerable blood in the body of the infant when discovered. Dr. Freese also testified about the umbilical cord, noting that it had been lacerated rather than cut, that there was a small blood clot in the area, and that the cord otherwise appeared normal. On cross examination he agreed that a healthy baby could appear to be dead when first born. After trial, defendant moved to reopen the proofs. The proofs were an affidavit from Dr. Konacki and a statement from Dr. Griffen. Dr. Konacki stated that a baby with a lacerated cord could have lost enough blood to go into shock and appear dead. Dr. Griffen stated that a newborn infant could appear dead to an untrained person and he described why that could be so. He also commented on the possibility of judgmental lapses resulting from the trauma of an untended birth.

In the extended argument on that motion the state represented that the impact of a torn cord was taken up by defendant's counsel with both Dr. Konacki and Dr. Freese before trial. The court concluded that, in any event, the proffered evidence would not have changed her decision. Upon a subsequent motion for a new trial, this time the

659, 498 N.E.2d 1167 (1986); *People v. Weeks*, 115 Ill.App.3d 524, 71 Ill.Dec. 472, 450 N.E.2d 1351 (1983).

Jones brought those cases to the Illinois courts' attention in her post-trial motions and in her appeal. The trial court held that each of those cases were factually distinguishable from the facts in this case. We agree. It is difficult to compare or to form "standards" with cases such as these since each case undoubtedly concerns unique facts and circumstances. It is the state courts' role to review the facts and evidence before it and to make findings of fact and law based on its observations. It is not for this court to question those findings where, as in this case, the evidence in the record, both circumstantial and direct, supports the state courts' findings.

defendant by new counsel urging that she had been ineffectively represented at trial, the state offered a sworn statement by Dr. Freese that the evidence indicated that the baby was healthy and vigorous after birth, that the infant was not in shock from blood loss, that the bleeding resulted from the injuries, and that the baby's respirations would have led to closure of the blood vessels in the cord. He also said he had so advised defendant's counsel before trial. While not directly countering the statement that prior counsel had discussed these matters with Dr. Freese, defendant's new counsel argued that they should at least have the opportunity to cross examine Dr. Freese about that statement if the court was going to consider it. The court denied the motion.

■■■ It is generally not considered to be ineffective assistance of counsel when an attorney makes the decision not to call certain witnesses to the stand or not to present a certain theory of a case. *U.S. v. Muehlbauer*, 892 F.2d at 668–69; *Cartee v. Nix*, 803 F.2d 296, 303 (7th Cir.1986), *cert. denied*, 480 U.S. 938, 107 S.Ct. 1584, 94 L.Ed.2d 774 (1987); *United States ex rel. White v. DeRobertis*, 566 F.Supp. 871, 874 (N.D.Ill.1983). There is evidence in the record that supports the appellate court's finding that Jones' counsel were aware that bleeding through the umbilical cord might possibly cause a baby to appear dead but that Dr. Freese had told defendant's counsel that was not a factor in this case. The attorneys' decision not to delve into the effects of the torn umbilical cord at trial (through cross examination or by questioning Dr. Griffin), is a strategic choice and one to which we give great deference.[1] *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

■■■ Second, Jones has not demonstrated that she was prejudiced by her attorneys'

actions. At trial, her counsel obtained the concession that a newborn could appear to be dead. The additional evidence also related to possibilities generally, not to possibilities or probabilities respecting the baby in this case. Further, the state presented a significant amount of evidence that contradicted the theory that the baby bled through the umbilical cord and appeared dead to Jones. For instance, Dr. Freese testified that it appeared the baby was born alive and healthy, and that the baby's skin tone was normal. In addition, Dr. Freese stated that the baby's vigorous respirations would have led to closure of the vessel leading to the umbilical cord, making it impossible for blood to be lost through the cord. Therefore, even if Jones was able to show that her attorney should have presented evidence about the lacerated umbilical cord, she still cannot establish ineffective assistance of counsel since she has not demonstrated that there is a reasonable probability that but for counsel's errors the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. In fact, the trial court stated that any evidence concerning the baby's torn umbilical cord would not have an impact on the court's decision.

### D. Whether Petitioner is Entitled to an Evidentiary Hearing on the Issue of Ineffective Assistance of Counsel

■■■ Jones argues that, to the extent this court does not find that the record establishes ineffective assistance of counsel as a matter of law, she is entitled to an evidentiary hearing to more fully develop the facts relating to her ineffectiveness claim. Jones' ineffective assistance of counsel claim centers on the fact that her lawyers did not introduce available expert evidence that Jones' baby appeared to be dead at the time of birth. Jones claims that she was "thwarted in her

4. Jones mentions that her trial counsel was incompetent by failing to call Dr. Griffin as a witness because in Dr. Griffin's view, Jones' judgment could have been impaired at the time of the delivery. In his post-trial statement, Dr. Griffin stated that the stress of giving birth might have caused a person in Jones' position to misjudge the baby's respirations and other signs that the baby was not stillborn. However, there was evidence presented at trial that indicated that

Jones was not suffering from impaired judgment. Furthermore, she held the baby for approximately ten minutes and did not check the baby's breathing, heartbeat or pulse. Again, counsel's decision not to present additional evidence that Jones might have had a lapse of judgment amounts to a strategic decision and one that, given the other evidence presented to the court, would not have prejudiced the defendant.

attempts to develop the state court record regarding her trial lawyers' failure." In particular, Jones argues that the trial court should not have admitted post-trial statements of Dr. Freese (that he had spoken with Jones' trial attorneys about the effects of a torn umbilical cord), without giving her the opportunity to cross examine Dr. Freese or to rebut his statements. In addition, Jones argues that she was prejudiced as a result of the decision to admit Dr. Freese's statements since the appellate court relied on those statements in finding that Jones was not denied effective assistance of counsel.

In order to be entitled to a federal evidentiary hearing, Jones must show cause for her failure to fully develop the facts in the state court proceedings and must demonstrate actual prejudice resulting from that failure. *Keeney v. Tamayo–Reyes,* —— U.S. ——, ——, 112 S.Ct. 1715, 1721, 118 L.Ed.2d 318 (1992). In addition, Jones' failure to develop a claim will be excused and a hearing mandated *only if* she can show that a fundamental miscarriage of justice would result from her failure to hold a federal evidentiary hearing. *Id.*

Generally, for a petitioner to establish "cause," he or she must demonstrate that some external impediment prevented counsel's efforts to develop the evidence. *McCleskey v. Zant,* 499 U.S. 467, 489, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991); *Jernigan,* 980 F.2d at 297; *U.S. ex rel. Free v. Peters,* 806 F.Supp. 705, 710 (N.D.Ill.1992). That is not the case here. Jones argues that the trial court erred in deciding to admit Dr. Freese's post-trial statements without providing her with the opportunity to cross examine Dr. Freese or to rebut his statements. It was not some "external impediment" that prevented Jones from developing evidence to support her ineffectiveness claim (that is, that her attorneys did not know about the effects of a torn umbilical cord), but it was the trial court's decision to allow Dr. Freese's sworn statement into evidence and to deny the admission of other post-trial statements. As a federal habeas court, it is our role to look for constitutional error and not, as in this case, to overturn either the factual or legal conclusions reached by the state court. *Keeney,* —— U.S. at ——, 112 S.Ct. at 1719.

In addition, Jones has not (and cannot) establish that a "fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing." To show a fundamental miscarriage of justice Jones would have to demonstrate by clear and convincing evidence that, but for a constitutional error, no reasonable trier of fact would have found her guilty. *Jernigan,* 980 F.2d at 297. As noted by the trial court, even if the evidence about the effects of the torn umbilical cord had been presented to the court, it would not have changed the court's conclusion. The state presented evidence which directly contradicted the theory that the baby bled through the umbilical cord and that the baby appeared dead to Jones. Thus, even assuming Jones' new mitigating evidence was presented at trial, it does not show that a reasonable trier of fact would not have found her guilty. Jones' request for a federal evidentiary hearing is therefore denied.

## CONCLUSION

For the reasons stated above, we deny Jones' writ of *habeas corpus* and her request for a federal evidentiary hearing. We suggest that defendant's most persuasive contention, the length of the sentence, is one that cannot be addressed by this court but can be addressed in a petition for clemency. At the time Jones gave birth she was nineteen years old and lived in a three-bedroom apartment with eleven other people. She had dropped out of high school and had a limited education. When she gave birth, Jones was undoubtedly under considerable stress, since she was alone in the bathroom of her mother's apartment and no one knew that she was pregnant. Jones did not have a previous criminal record and, during the trial, was portrayed by her family and friends as a shy teenager who cared deeply for her son Darryl. In her sentencing, Jones' counsel requested the minimum sentence for murder of twenty years. The trial court sentenced Jones to concurrent prison terms of thirty-four years for murder and five years for concealment of a homicide. Jones has

now been incarcerated for over nine years. We do not know what her institutional adjustment has been. The circumstances of the offense and defendant's subsequent adjustment may well merit executive review.