**UNITED STATES of America ex rel. Dennis EMERSON, Petitioner,**

v.

**Richard GRAMLEY, Warden, Pontiac Correctional Center, Respondent.**

No. 93 C 4650.

United States District Court, N.D. Illinois, Eastern Division.

March 30, 1995.

Prentice Henry Marshall, Jr., Linton Jeffries Childs, Sidley & Austin, Chicago, IL, for plaintiff.

Terence Madsen, Michael Marc Glick, Illinois Attorney General's Office, Chicago, IL, Margaret Mary Regan, Sp. Asst. States Atty., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

■ Petitioner Dennis Emerson brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Emerson essentially raises three challenges to his conviction and sentence: (1) he was afforded ineffective assistance of counsel at the guilt-innocence phase of the trial, (2) he was afforded ineffective assistance of counsel at the sentencing phase of trial, and (3) he was sentenced under an unconstitutional sentencing scheme. For the reasons set forth below, his petition is granted in part and denied in part.

### I. Background [1]

In his second trial a jury in the Circuit Court of Cook County convicted petitioner of murder, attempted murder, aggravated arson and two counts of armed robbery.[2] The

---

1. The findings of fact made by the state courts in Emerson's direct appeal and post-conviction proceeding are entitled to a presumption of accuracy. 28 U.S.C. § 2254(d). Petitioner asserts, however, that the findings of the Illinois Supreme Court on direct appeal are not entitled to such deference because they were not issued after an oral hearing with live testimony. The factual findings of state trial courts and appellate courts are entitled to the same presumption of accuracy. See Sumner v. Mata, 449 U.S. 539, 546–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981); Cuppett v. Duckworth, 8 F.3d 1132, 1141 (7th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1226, 127 L.Ed.2d 571 (1994). To be sure, as petitioner had no opportunity to raise facts

outside the record in his direct appeal, we do not presume the accuracy of any purported "findings" on these issues. See United States ex rel. Partee v. Lane, 926 F.2d 694, 700 (7th Cir.1991) ("state court must have made a finding on a particular issue before a federal court can defer to that finding"), cert. denied, 502 U.S. 1116, 112 S.Ct. 1230, 117 L.Ed.2d 464 (1992); see also 28 U.S.C. § 2254(d)(3) (findings made without adequate factual development not preclusive).

2. Petitioner's first conviction and death sentence were reversed on direct appeal. People v. Emerson, 97 Ill.2d 487, 74 Ill.Dec. 11, 455 N.E.2d 41 (1983).

same jury then imposed a sentence of death. Emerson appealed to the Illinois Supreme Court, which reversed his conviction on the aggravated arson count but affirmed all other counts and affirmed his sentence of death. *People v. Emerson,* 122 Ill.2d 411, 119 Ill. Dec. 250, 522 N.E.2d 1109 (1987), *cert. denied,* 488 U.S. 900, 109 S.Ct. 246, 102 L.Ed.2d 235 (1988). Emerson filed a petition for post-conviction relief, as well as a supplemental petition upon his retention of counsel, both of which were denied by the state trial court without a hearing. The Illinois Supreme Court affirmed the denial of post-conviction relief, and the United States Supreme Court denied certiorari. *People v. Emerson,* 153 Ill.2d 100, 180 Ill.Dec. 46, 606 N.E.2d 1123 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1865, 123 L.Ed.2d 485 (1993). Emerson filed the instant petition on August 3, 1993.

The primary evidence at both of petitioner's trials was the testimony of Robert Ray, the co-owner of the Centaur Lounge in Chicago and an acquaintance of Emerson's for many years. He testified that he was working at the Lounge on August 12, 1979, and that Emerson called him numerous times that day to tell him he would be stopping by the bar. Ray testified that he closed the tavern at approximately 1:15 a.m., and that petitioner, accompanied by his brother Richard Jackson ("Jackson"), arrived some time later. The three men then went to Ray's apartment at the rear of the Lounge, where they were soon met by Ray's girlfriend, Delinda Byrd. Ray briefly left the group to buy some cigarettes from a store across the street, and then returned to the apartment.

Ray testified that as he was opening the package of cigarettes, Emerson pulled out a gun and ordered him and Byrd to lie on the floor. Petitioner then bound their hands and feet with some electrical cord he found in the apartment, and began pilfering the cash register in the tavern. After Ray told Emerson where he kept jewelry and guns in his apartment, petitioner gathered these items as well as any money Ray and Byrd had in their possession. While Emerson was collecting

his booty, Jackson kept the gun on Ray and Byrd as they lay on the floor.

Ray then testified that Jackson and Emerson went into the kitchen, where Jackson picked up a half pair of scissors and told petitioner to "use this." At this point, Emerson went over to the victims and stabbed them in the chest and back several times. Jackson and Emerson then started a fire in Ray's bedroom and threw Ray and Byrd in the flaming room. Ray testified that because he heard the door knob being rattled, he waited until the noise stopped before untying his hands and opening a window. He then fell out the window about eight feet into an airshaft between his building and the one next door. Ray claimed that Byrd also fell out of the window into the airshaft, and that he untied the remaining bindings on them. Ray then climbed back into the bedroom, but was unable to open the door. He crawled back into the airshaft and tried to enter the apartment through the kitchen window, but found the kitchen enveloped in smoke and flames. Finally, Ray entered a window leading into the Lounge and ran out the front door and summoned for help. Ray testified that he then ran back into the building, but was unable to extricate Byrd from the airshaft.

Firefighters later recovered Byrd's body from the airshaft, and medical testimony at trial established that she had been stabbed five times in the back, and had died from a combination of massive blood loss and extensive burns. Inside the apartment firefighters recovered lengths of electrical cord, the door knob and lock assembly to the bedroom door and a coat hanger found next to them. No scissors or shears were found in the apartment.

At one point during the State's case, outside the presence of the jury, Emerson expressed to the court his displeasure with the performance of his lawyer, Assistant Public Defender James Sammons. Trial Rec., Vol. III at 357.[3] Emerson also lamented that Sammons had not previously discussed trial strategy with him and resisted calling any witnesses. *Id.* at 359–60. After having his

---

**3.** The record of proceedings in petitioner's first two trials is denoted as "Trial Rec., Vol. #." The record during his post-conviction proceedings is abbreviated "P.C. Rec."

complaints rebuffed by the trial judge, Emerson declared that he would have nothing to do with the rest of the proceedings and would sit out the remainder of the trial in the back of the courtroom. *Id.* at 363–70.[4]

At the close of the State's case, Sammons indicated that he planned to rest without calling any witnesses. Trial Rec., Vol. III at 431. His client, however, demanded that certain witnesses be called in his defense. First, Emerson called his brother Ricky Jackson ("Ricky") to the stand and began to question him about Ray's possible motive for lying, but objections to his questions were sustained. Trial Rec., Vol. III at 437. Sammons then examined Ricky and elicited that he had been employed by Ray for a period of time before the alleged robbery. Sammons tried to inquire as to a possible motive for Ray to testify falsely, but his questions brought an objection from the State. *Id.* at 443. Outside the presence of the jury, Emerson told the judge that he wanted to ask about a loan he had made to Ray, and establish that this loan was the reason for Ricky's employment. *Id.* at 444. Sammons told Emerson and the court that he had asked all the questions he would on the topic, since his inquiries had been ruled objectionable. *Id.* at 445.[5] The judge then explained to Emerson that Ricky could not testify as to what Ray or Emerson had told him; rather, Emerson would have to testify himself as to the existence of the alleged loan. When the jury returned, Sammons did not ask Ricky any further questions.

Emerson next directed Sammons to call his mother, Ms. Jessie Jackson, to the stand. However, Emerson refused to remain in the front of the courtroom during this examination. Rather, he insisted on sitting in the holding cell in the rear of the courtroom. When Ms. Jackson took the stand, Sammons indicated that he had no questions for her and she was asked to step down.[6]

Finally, petitioner requested that his brother (and co-defendant) Jackson be permitted to testify. At Emerson's direction, and over the protest of Jackson's attorney, Sammons asked Jackson if he had any further information as to the events of August 12–13, 1979. Jackson testified that on August 12 he had asked Emerson for a few hundred dollars, but Emerson had been unable to help him out. According to Jackson, Emerson then said that Ray owed him some money, and he offered to have Ray pay part of that debt to Jackson. Emerson called Ray to tell him that his brother was going to collect some of the money he owed him, and later on that day Jackson went to see Ray at the Centaur Lounge with a friend named Phillip Anderson. Jackson told the jury that at one point during the meeting Anderson realized "this [was] not what he come for," and pulled a gun on Ray. Trial Rec., Vol. III

4. The following is an example of Emerson's diatribes against Sammons and the proceedings:
Mr. Emerson: Yeah, well, I'm stating for the record I think this man is incompetent. I don't want no parts to do with him. I'm going to sit this all out. You go ahead, do what you want to do because that's what you doing now, you know, almost like—you know, he just waiting for his role to come up. And then, do what he already told to do.
Trial Rec., Vol. III at 361.

5. Mr. Sammons: I understand your ruling, Judge. That's all I can tell you. That's just what I was trying to bring out and I asked all the questions I'm going to ask along those lines. This came out over my advice. You said you were going to let him ask questions and then, you stopped him from asking questions.
The Court: Because he's asking—
[Prosecutor]: He didn't ask questions.
Mr. Sammons: I, as a lawyer with a man's life in my hands, asked some questions I didn't want to ask in the first place. Now, you sustained the objections to those and that's about as far as I can take it.
Trial Rec., Vol. III at 445.

6. Mr. Sammons: I didn't ask to call this lady. He did.
The Court: Pardon me?
Mr. Sammons: I didn't ask to call this lady.
The Court: You want to conference with your attorney for a second?
Mr. Sammons: I have conferred all I want to, Judge.
Mr. Emerson: Yes. Your Honor—
[Prosecutor]: Judge, we'd object at this point. We'd ask the jury be excused.
The Court: Objection sustained.
Mr. Emerson: I know the jury is prejudiced against me already. I know that. It's a conspiracy.
The Court: Mr. Emerson, be seated.
Trial Rec., Vol. III at 449.

at 453–57. Soon afterwards Ray's girlfriend entered the apartment, and Jackson and Anderson proceeded to tied them up, stab them, set the apartment on fire, and lock them in the flaming room. On cross-examination, Jackson admitted that he had never told this story to anyone else before that day.

Sammons rested for the defense after Jackson's testimony. In closing argument the prosecution stressed the veracity of Ray's testimony as well as the fact that it was essentially corroborated by Jackson. Sammons then made the following closing argument:

> Ladies and gentlemen, this case has become bizarre, in and out. A state of confusion during this trial as I suppose you can tell due to the fact that my client and I have disagreement—disagreements about how this case should be tried. And, of course, as you heard, the testimony of his brother that you heard a few moments ago was something no one heard, including myself and his own lawyer until the time he took the stand and gave it. But as long as this man's life is in my hands, I'm going to do my best to save his life.
>
> I can still look you in the eye with all this evidence and say this. That I don't believe that two people went into that place that night with the idea to commit an armed robbery. And there's a difference between just a simple murder and felony murder. I know it sounds terrible, but in our law, there's a difference between when a man commits murder and when a man commits murder in the course of a felony.
>
> . . . .
>
> If you have any doubts about the counts of armed robbery which will be submitted to you in this case with respect to Dennis Emerson, please, at this point, find him not guilty of armed robbery. It does make a difference. And as I say, I don't think two men planning to go into a saloon, a tavern

in this particular area and planning to commit a robbery, planning to take the weekend proceeds—

[Prosecutor]: I'm going to object at this point. Whether they planned it or not is not relevant. The fact they did it or not is relevant.

The Court: Overruled. I'll instruct the jury as to the law.

Mr. Sammons: In planning to murder the witnesses so there would be no witnesses to it, you never call up and announce their arrival. Would never allow this man to leave, go out and get cigarettes. That's all I'm saying. If this was a murder, it was a murder. If there is a reasonable doubt that this was a murder committed in the course of a forcible felony or armed robbery, I'm asking you to so indicate by signing verdict forms of not guilty with respect to these armed robbery counts. And that's all I'm asking you. Thank you.

Trial Rec., Vol. III at 477–79.[7] In rebuttal the prosecution again attacked Jackson's credibility and stressed that Ray's testimony was believable.

After the jury found Emerson guilty of murder, attempted murder, armed robbery and aggravated arson, Sammons moved for a mistrial but this motion was denied without argument. The State then moved for a death penalty hearing, which was held the following day. Sammons submitted the issue of eligibility to the jury without evidence or argument, and the jury found Emerson death eligible.

The aggravation-mitigation phase of sentencing then began. Although the prosecution made an opening statement, Sammons declined to do so. Further, Sammons asked only one question during cross-examination of the state's witnesses. Trial Rec., Vol. III at 552–80.[8] At the close of the prosecution's evidence, Sammons stated "my client wishes

7. Emerson claims in his affidavit that Sammons intended to waive closing argument, and that he only made the preceding statement at Emerson's insistence. P.C. Rec., Supp., Tab 1, ¶9. In his deposition some nine years after the trial, Sammons could not remember whether he discussed closing argument with Emerson. Sammons Dep. at 292–93.

8. Sammons did object to certain exhibits being returned to the jury room, as well as the form of the stipulation read to the jury regarding Emerson's prior convictions. *Id.* at 581–82.

me to present no evidence, make no argument and wishes to remain in the back." *Id.* at 584. At the prompting of the prosecutor, the judge brought Emerson up from the back of the courtroom and conducted the following inquiry:

> The Court: All right. Mr. Emerson, you have heard what your attorney just said, that you basically have no evidence to presen[t] in mitigation. And you have no witnesses and you do not wish to be out here, is that correct, sir?
>
> Mr. Emerson: (nodding)
>
> The Court: Did you hear that in the back?
>
> Mr. Emerson: No. I was listening.
>
> The Court: Pardon me?
>
> Mr. Emerson: I wasn't listening.
>
> The Court: Is the speaker on in the back if you want to listen?
>
> Mr. Emerson: Yeah, it's on.
>
> The Court: Okay. Fine, sir. So, you don't want to present any evidence, is that correct sir? You have the right to present any evidence, is that correct sir?
>
> Mr. Emerson: I don't want to.
>
> The Court: Okay. Fine, sir. You wish to remain in the back as opposed to sitting in the courtroom?
>
> Mr. Emerson: Yeah.

Trial Rec., Vol. III at 584–85. The state then read stipulations to the jury and made its closing argument, and Sammons submitted the case to the jury without argument. *Id.* at 585–92. The jury returned that same day with a sentence of death. *Id.* at 603.

## II. Discussion

Petitioner contends that his trial and sentencing were conducted in violation of the federal constitution, requiring us to overturn his conviction and sentence of death. First, he argues that Sammons provided him ineffective assistance of counsel at both the guilt-innocence phase and the sentencing phase of the trial in violation of his Sixth and Fourteenth Amendment rights. Second, he contends that he was sentenced under a statute

that breaches the guarantees of the Sixth, Eighth and Fourteenth Amendments.

### A. Exhaustion and Default

 At the outset, we must consider whether Emerson has exhausted his state court remedies and not procedurally defaulted any of his claims.[9] The exhaustion requirement of 28 U.S.C. § 2254 requires habeas petitioners to seek vindication of their federal constitutional rights in the courts of the various states before requesting relief in the federal system. *Engle v. Isaac,* 456 U.S. 107, 125–26 n. 28, 102 S.Ct. 1558, 1570–71 n. 28, 71 L.Ed.2d 783 (1982). Thus, a petitioner must present his federal claims to the highest available state court, or no longer be able to present them in the state system, in order to satisfy the exhaustion requirement. *See Resnover v. Pearson,* 965 F.2d 1453, 1458 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2935, 124 L.Ed.2d 685 (1993). In contrast, procedural default occurs when a petitioner's claims are rejected by a state court pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson,* 501 U.S. 722, 729–31, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991). Generally, this occurs where the petitioner, although pursuing all appeals required by state law, fails to raise a federal constitutional issue in state court, *Resnover,* 965 F.2d at 1458–59, or where he fails to pursue his state appeals and the state court to which he would present his claim would find it procedurally barred. *Coleman,* 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1; *Jenkins v. Gramley,* 8 F.3d 505, 507–08 (7th Cir.1993). Where a federal claim is procedural defaulted pursuant to an independent and adequate state rule, "federal habeas review of the claim[ ] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565; *see also Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

9. Although these two concepts are conceptually distinct, they are often confused by litigators and judges. *See United States ex rel. Sumner v. Washington,* 840 F.Supp. 562, 568 (N.D.Ill.1993).

■ Respondent concedes that Emerson has exhausted his state court remedies, so we need only address the question of procedural default. The State contends that petitioner failed to raise on direct appeal in the state court the following objections to Sammons's performance during the guilt-innocence phase of his trial: (1) Sammons's failure to make an opening statement, (2) his cross examination of Ray, (3) his failure to have Emerson testify, and (4) his failure to object to the improper cross-examination of defense witnesses.[10] Only if these claims were "fairly presented" to the state courts—ie., petitioner proffered both the underlying factual basis and the federal theory supporting each claim—can Emerson avoid procedural default. *See Picard v. Connor,* 404 U.S. 270, 275–76, 92 S.Ct. 509, 512–13, 30 L.Ed.2d 438 (1971). The first three of these claims were first presented to the Illinois courts in Emerson's post-conviction petition, and the fourth was only raised in his § 2254 petition. Under Illinois law a claim that could have been raised on direct appeal but was not is waived and is not subject to review in subsequent direct or collateral review, *People v. Barnard,* 104 Ill.2d 218, 83 Ill.Dec. 585, 588, 470 N.E.2d 1005, 1008 (1984), unless disposition of the issue would require the consideration of matters outside the record. *See People v. Morris,* 229 Ill.App.3d 144, 171 Ill.Dec. 112, 127, 593 N.E.2d 932, 947 (1992) (post-conviction petition may contain issues outside record), *app. denied,* 146 Ill.2d 644, 176 Ill.Dec. 814, 602 N.E.2d 468 (1992). In Emerson's appeal of the denial of his post-conviction petition, the Illinois Supreme Court held that petitioner was barred from relitigating the effective assistance of counsel claims that he

raised on direct appeal. Further, the court held that Emerson could not simply raise "additional factors supporting his claim" in his post-conviction petition, since those matters could have been raised on direct appeal. *People v. Emerson,* 153 Ill.2d 100, 180 Ill. Dec. 46, 49, 606 N.E.2d 1123, 1126 (1992); *see People v. Albanese,* 125 Ill.2d 100, 125 Ill.Dec. 838, 840, 531 N.E.2d 17, 19 (1988), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2088, 104 L.Ed.2d 652 (1989).[11] Because each of these alleged errors would have been evident from the trial transcript, Emerson cannot contend that matters outside the record need to be considered in order to determine the constitutionality of Sammons's performance.[12] As petitioner has neither alleged cause for failing to raise these issues nor any prejudice arising therefrom, he is barred from presenting them in his § 2254 petition.

### B. *Ineffective Assistance at Trial*

■ The Sixth Amendment, as applied to the states through the Fourteenth Amendment, guarantees criminal defendants the right to the effective assistance of counsel at trial. *Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). In order to prevail on his ineffective assistance of counsel claim petitioner must demonstrate that Sammons's performance fell below an objective standard of reasonably effective representation, *id.* at 687–88, 104 S.Ct. at 2064–65, and that he was prejudiced by this ineffectiveness. *See Lockhart v. Fretwell,* —— U.S. —— - ——, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993) (prejudice must be so great as to render the proceeding "fundamentally unfair or unreliable"). "[F]ailure to establish either one of the two

**10.** Respondent also maintains that Emerson failed to raise the argument that Sammons expressed disbelief in Jackson's testimony before the jury. However, this issue was raised on direct appeal, Pet.App.Br. at 30, and did have to be raised again in Emerson's post-conviction petition as it would have been barred by the doctrine of res judicata. *See Reese v. Peters,* 926 F.2d 668, 670 (7th Cir.1991).

**11.** Because the Illinois Supreme Court's opinion disposing of Emerson's post-conviction appeal did not fairly appear either to rest primarily on federal law, or to be interwoven with federal law, we need not decide whether the court "clearly and expressly rel[ied] on an independent and

adequate state ground" in disposing of these claims. *See Coleman,* 501 U.S. at 734–36, 111 S.Ct. at 2557.

**12.** Petitioner argues that only by comparing the performance of counsel in the first trial with Sammons's performance at the second trial can the issue of adequacy be properly examined. We disagree. The adequacy of trial counsel must be evaluated with regard to the circumstances of the specific trial at issue, not in comparison to other trials. *See Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2065–66, 80 L.Ed.2d 674 (1984).

components is fatal the claim." *United States v. Slaughter*, 900 F.2d 1119, 1124 (7th Cir.1990). In analyzing claims of ineffectiveness, we must engage in the strong presumption that counsel's performance fell within the range of professional competence and that the original verdict was reliable. *United States ex rel. Partee v. Lane*, 926 F.2d 694, 700–01 (7th Cir.1991), *cert. denied*, 502 U.S. 1116, 112 S.Ct. 1230, 117 L.Ed.2d 464 (1992).

Emerson argues that his attorney's actions at trial fell below Sixth Amendment standards in that (1) he failed to sufficiently interview and consult with Emerson prior to trial, (2) he neglected to investigate and prepare witnesses in Emerson's defense, (3) he failed to develop a coherent theory of defense, (4) he conceded Emerson's guilt during closing argument, (5) he failed to object to the State's closing argument, and (6) he demonstrated antagonism towards Emerson throughout the trial.

### 1. Failure to Interview/Consult with Emerson

■ Petitioner contends that prior to his second trial he only met with Sammons for forty-five to ninety minutes on February 19, 1985. Sammons believes that he also met with Emerson in a joint session with co-defendant Jackson and his attorney on or about February 26, 1985. Apart from these two meetings, and pretrial proceedings on the record, neither Sammons nor Emerson has any recollection of speaking with each other about the case. Petitioner argues that by failing to sufficiently interview his client and consult with him about the strategy to be employed at trial, Sammons was unable to effectively defend him at trial.

Respondent argues that no minimum number of meetings is required in order for counsel to provide reasonably effective representation. *See United States v. Olson*, 846 F.2d 1103, 1108 (7th Cir.), *cert. denied*, 488 U.S. 850, 109 S.Ct. 131, 102 L.Ed.2d 104 (1988). A well-seasoned attorney "can get more out of one interview with a client than a neophyte lawyer," *United States ex rel. Kleba v. McGinnis*, 796 F.2d 947, 954 (7th Cir. 1986), and thus a large number of encounters need not be undertaken in order for counsel to competently defend a client. *See United States v. Olson*, 846 F.2d 1103, 1108 (7th Cir.1988) (experienced attorney not ineffective by meeting with client only twice prior to trial); *Schwander v. Blackburn*, 750 F.2d 494, 499–500 (5th Cir.1985) (failure to meet with client until date of trial not ineffective assistance).

While we do not applaud Sammons's decision to meet with Emerson on only one or two occasions, given the circumstances of the case and the availability of the transcript of the first trial, we cannot conclude that his performance fell below the constitutional standard. Sammons's began his representation of Emerson on February 19, 1985, after petitioner's original counsel—who had been appointed one year earlier—withdrew due to serious differences with his client over trial strategy. Prior to the start of trial on March 25, 1985, Sammons met with Emerson for at least forty-five to ninety minutes. Moreover, Sammons was able to evaluate Emerson's potential testimony by reviewing the transcript of the first trial. The case did not present any complex issues of fact or law, nor would Emerson's testimony have been difficult for Sammons's to direct had he taken the stand. Absent any indication that the case required extensive discussions between Emerson and Sammons, we decline to hold that a forty-five to ninety minute meeting between a defendant and his lawyer fails to satisfy the requirements of the Sixth Amendment.[13]

---

**13.** Petitioner points us to *Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355, 1356–58 (4th Cir.1992), for support of his contention that Sammons was deficient. However, defense counsel in *Griffin* performed no investigation prior to trial, failed to notify prosecutors of possible alibi witnesses (as required by rule), and failed to secure the presence of such witnesses in court, all because he thought the defendant would plead guilty on the day of trial.

Because counsel offered no reasonable excuse for failing to notify the state of alibi witnesses and bringing them to court, the Fourth Circuit found his performance constitutionally deficient. Not only does this case not address the issue of pretrial contact with the defendant, it differs from the case at bar in that Sammons did prepare the case and did inform the prosecutor of potential alibi witnesses, but simply chose not to

Further, petitioner has failed to "affirmatively prove prejudice" resulting from his infrequent contact with Sammons. *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067–68. Emerson argues that because Sammons did not discuss with him the nature and value of potential alibi witnesses, counsel was unable to develop a coherent. theory of defense. However, petitioner's argument relies on the fallacious underlying assumption that an alibi defense was the only viable means of avoiding a conviction. Rather, as we discuss below, Sammons's conduct at trial was consistent with a plausible theory of the case which did not depend on alibis. Although every defendant might want greater contact with his or her lawyer, there is no indication here that Emerson was prejudiced by his limited interaction with Sammons. *See United States v. Soto–Alvarez*, 958 F.2d 473, 478 (1st Cir.) ("Though defendant's meetings with counsel may have been short, he fails to establish how the short length of his meetings with his attorney before trial affected his attorney's actual performance during trial."), *cert. denied*, —— U.S. ——, 113 S.Ct. 221, 121 L.Ed.2d 159 (1992). Accordingly, we deny petitioner's claim based on infrequent discussions with his lawyer.

### 2. Failure to Interview or Prepare Alibi Defense

■ "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Montgomery v. Petersen*, 846 F.2d 407, 412 (7th Cir.1988) (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066); *United States ex rel. Williams v. Washington*, 863 F.Supp. 697, 704 (N.D.Ill. 1994). Although counsel need not investigate every conceivable avenue of defense, potential witnesses must be contacted unless the attorney makes a rational decision not to

conduct what he believes to be unnecessary investigation. *Montgomery*, 846 F.2d at 413.

■ Emerson maintains that Sammons did not conduct an adequate investigation into his potential alibi defense. He claims that by not speaking with the attorneys who represented him at his first trial, discussing the case only briefly with his prior counsel in the second trial, and failing to interview Emerson's mother and ex-wife as potential alibi witnesses,[14] Sammons provided constitutionally deficient assistance. We disagree. In preparing for trial Sammons reviewed the transcript of the first trial, as well as the Illinois Supreme Court opinion reversing Emerson's first conviction. In speaking with Emerson's first attorney in the retrial, Sammons learned that no new witnesses or evidence would be introduced, and his own investigation of the record revealed that no new information would need to be presented.[15] He was aware of the testimony that could be developed at the second trial by the State's witnesses, as well as Emerson's, and could evaluate potential avenues for impeachment.

Furthermore, as discussed more fully below, Sammons's theory of the case did not entail the presentation of the alibi defense that Emerson contends should have been presented. Rather, Sammons's theory revolved around discrediting Ray's testimony and suggesting that Ray had committed the crime. Sammons's decision not to interview the witnesses Emerson now claims were essential to his case was not irrational, since he reasonably chose not to pursue an alibi defense and therefore had no need to interview them. Nor are we presented with a case like *Montgomery*, 846 F.2d at 413–14, where counsel failed to call the only disinterested alibi witness available to the defendant. In the instant case, the only witnesses Emerson contends should have been called were his

---

utilize them in Emerson's defense. Trial Rec., Vol. III at 91.

**14.** Emerson also argues that his aunt could have provided alibi testimony for him, but this claim was not presented in either his direct appeal or his post-conviction petition. As petitioner has failed to demonstrate cause and prejudice with regard to this issue, it is procedurally defaulted. *See Resnover*, 965 F.2d at 1458–59.

**15.** We note that Emerson's first conviction was reversed because of the introduction of improper evidence, not because the case against him was somehow defective. Consequently, there was no reason for Sammons to believe that he needed to look outside the trial transcript in order to prepare the case effectively.

mother and his ex-wife, patently interested witnesses of little value to the case. In sum, we cannot conclude that the failure to investigate and prepare two interested alibi witnesses, who were not essential to the defendant's theory of defense, constituted ineffective assistance.

Moreover, even if Sammons was deficient, Emerson has failed to demonstrate that he suffered any prejudice. With regard to his ex-wife, Emerson has not submitted any evidence indicating what her testimony would have been. Nor can we glean what she would have said from the transcript of the first trial, since she did not testify. As petitioner has failed to demonstrate that his ex-wife would have provided any meaningful evidence on his behalf, he cannot demonstrate prejudice from failing to call her. See United States v. Rodgers, 755 F.2d 533, 541 (7th Cir.), cert. denied, 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985).

As to any potential testimony his mother may have given, Emerson has inadequately demonstrated that she would have provided a viable alibi defense. Ms. Jackson stated in an affidavit submitted with Emerson's petition for post-conviction relief that "during the night of Sunday, August 12, 1979, and the early morning hours of Monday, August 13, 1979, my son Dennis Emerson was at my home (6715 South Sangamon Avenue, Chicago, Illinois) until approximately 3:30 a.m." P.C.Rec., Supp., Tab 3, ¶ 2. However, this testimony has several serious problems. First, the attack on Ray occurred sometime just prior to 4:00 a.m. on August 13, 1979; thus, Ms. Jackson's claim that Emerson was at her house until 3:30 a.m. would not preclude him from being the attacker. Second, the credibility of this testimony is seriously undermined by the fact that Ms. Jackson is petitioner's mother. Third, Emerson testified at the first trial that everyone in the house was asleep after midnight, suggesting that Ms. Jackson would have no idea of when Emerson actually left. Considering these defects, we find that the failure to present the proffered testimony of Ms. Jackson during the guilt-innocence phase of trial did not prejudice petitioner.

Emerson also points to the absence of any written notes in his case file from the Public Defender's Office as proof that Sammons did not prepare the case. Sammons claims that he did prepare such notes, which outlined the examinations he would conduct and the testimony of the witnesses, but that they somehow must have been lost in the time since the trial. Emerson has not directly attacked this assertion, but merely suggests that because Sammons's regular practice was to take written notes and leave them in the file, the failure to find such notes indicates that he did not follow this regular practice in his case. However, the underlying premise of his argument—that Sammons always made notes and prepared for his cases—also weighs in favor of the opposite conclusion that Sammons did indeed make such notes and their absence is simply an unfortunate occurrence. Regardless, even if no notes were made, at worst this demonstrates that Sammons did not use hand-written notes when preparing his examinations. Not only does this appear reasonable given that Sammons had the transcript of the previous trial, but we are unaware of any case holding that the failure of an attorney to use written notes constituted ineffective assistance. As petitioner has failed to demonstrate deficient performance or prejudice stemming from Sammons's activities in preparing the case, this claim is denied.

### 3. Theory of Defense

Petitioner contends that Sammons failed to develop a coherent theory of defense, and that even if he had such a theory, it was inadequately advanced before the jury. Counsel's creation of a theory of the case is not grounds for a finding of ineffectiveness so long as the decision was rational and based on adequate investigation. See Strickland, 466 U.S. at 690–91, 104 S.Ct. at 2065–67. Moreover, counsel's performance should not be analyzed though the lens of hindsight, since every convicted felon might then have a persuasive argument of inadequate representation. See id. at 689, 104 S.Ct. at 2065. So long as counsel's performance was consistent with a rational theory of defense at the time of trial, we will not find it inadequate.

■ Respondent maintains that Sammons's theory centered around suggesting that Ray was actually responsible for the crime.[16] The State claims that Sammons sought to persuade the jury (1) that Ray was not credible, (2) that Ray was conducting illegal activities in the Centaur Lounge on the night of August 12–13, and (3) that he did not help Byrd escape from the burning building. In his cross-examination, Sammons tried to elicit from Ray (with varying degrees of success) that he had a fractious relationship with Byrd, that he did not help her stop the bleeding from her wounds, and that he failed to assist her out of either the burning building or the airshaft. Sammons also highlighted Ray's claim that Emerson told Ray several times that day he would be coming over to the Lounge, and suggested that such behavior was inconsistent with that of a man intending to commit a murder. To be sure, Sammons did not obtain all of the admissions that he hoped to extract out of Ray and the other witnesses. For example, although Sammons suggested by his questioning that Ray did not try to save Byrd, Ray testified that he did help untie the electrical cord that bound her hands. Nonetheless, Sammons conducted the trial in a manner consistent with his asserted theory of defense, and its presentation to the jury was not so inept as to amount to constitutional error.

■ Emerson also challenges his lawyer's decision not to present an alibi defense. At the outset we observe that Emerson did not present this defense at his first trial, but rather, tried to show that because Ray owed him $5000, he had a motive to falsely accuse Emerson of the crime. At the second trial, Sammons did not present a defense that involved either this prior loan or potential alibi testimony, except to the extent it was forced upon him by Emerson's insistence at calling his mother and brothers to the stand. In general, counsel's decision not to present a particular theory of the case does not amount to ineffective assistance. *United States v. Muehlbauer*, 892 F.2d 664, 668–89 (7th Cir.1990); *United States ex rel. Jones v. Washington*, 836 F.Supp. 502, 509 (N.D.Ill. 1993), *aff'd*, 32 F.3d 570 (7th Cir.1994); *cf. United States v. Loscalzo*, 18 F.3d 374, 385 (7th Cir.1994) ("the decision not to call a witness is a tactical choice which is not subject to review"). While it is true that counsel's failure to present the only available defense can violate the Sixth Amendment, *Keys v. Duckworth*, 761 F.2d 390, 392 (7th Cir.1985), if the particular theory chosen by counsel is reasonable given the amount of investigation he performed, then we will not find his performance constitutionally defective. *See Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2065–67.

Although the theory presented in the instant case was not particularly robust, it was not unreasonable to pursue this course rather than the unattractive alternatives. Emerson's alibi defense was based solely on the testimony of interested family members, whose statements contained significant inconsistencies with each other and with the facts adduced at trial.[17] This sort of alibi is not

---

16. We are hampered in determining whether this indeed was Sammons's theory by a number of factors. First, as we discuss in detail below, counsel's closing argument was marred by problematic testimony presented at the insistence of Emerson. Second, the passing of some fifteen years between the trial and discovery in the instant matter has clouded the memories of the participants. Third, the absence of either preparatory or trial notes by Sammons prevents us from recreating his mental processes. Nonetheless, counsel's performance in the courtroom and his statements made in resolving Emerson's post-conviction petition are sufficient for us to discern a viable theory.

17. At his first trial Emerson testified that he was at home with his mother, sister, and two brothers on the night of August 12–13, 1979, and that they were all asleep before midnight. He also testified that he spent part of the night at his ex-wife's house, first claiming that he left his home between 4:00 a.m. and 5:00 a.m., then stating that he left about 3:30 a.m. or 4:00 a.m.

In contrast, Ricky Jackson testified at the first trial that he was not at his mother's house that night, but spent the evening at his girlfriend's apartment. Although Ms. Jackson asserts in her affidavit that Emerson was home until 3:30 a.m. on the morning of August 13, Emerson himself testified that she was asleep and thus would have no personal knowledge of his departure time. Finally, Officer Griffen testified that he found no males present in Ms. Jackson's house when he searched soon after responding to the fire at Ray's apartment. These inconsistencies seriously undermined the viability of Emerson's alibi defense.

the type of "slam-dunk" defense that should always be presented to the jury. *Cf. Harris v. Reed,* 894 F.2d 871, 877–79 (7th Cir.1990) (failure to call two unbiased, credible witnesses who saw another man running from crime scene, after such evidence was previewed to jury, was unreasonable); *Sullivan v. Fairman,* 819 F.2d 1382, 1391–93 (7th Cir.1987) (failure to present credible exculpatory evidence from disinterested witnesses was unreasonable). The "loan" defense also had critical factual problems. The funds allegedly loaned to Ray were obtained from a bank robbery Emerson committed, and the loan was supposedly made at a time when Emerson was in custody on another offense. Moreover, testimony about the loan could only be introduced by having Emerson himself take the stand. Given these factual problems, the close relationship between Emerson and his potential alibi witnesses, and the weakness of their proffered testimony, it was not unreasonable for Sammons to avoid these defenses.[18] *Cf. Johnson v. Lockhart,* 921 F.2d 796, 799 (8th Cir.1990) (decision not to call alibi witnesses of questionable credibility was matter of trial strategy). Accordingly, we decline to find Sammons's choice of theory to amount to constitutional error.

### 4. Closing Argument

▮ Petitioner maintains that in closing argument Sammons conceded Emerson's guilt to the jury, thereby violating his duty to provide effective assistance consistent with his client's plea of not guilty. At the outset, we observe that Sammons's closing argument must be evaluated in the context of the trial. Although Sammons spent much of the trial attempting to discredit Ray's testimony and suggest that he was actually responsible for the murder of Byrd, at Emerson's insistence Richard Jackson took the stand. Emerson's brother then corroborated Ray's testimony in almost every relevant respect, thereby eviscerating much of Sammons's theory. The only difference between Jackson's testimony and Ray's was that Jackson claimed that Phillip Anderson, and not Dennis Emerson, accompanied him to the apartment that night. This testimony had never been disclosed to anyone prior to the second trial, and contradicted Jackson's own defense, thereby placing Sammons in a difficult position when explaining this evidence in his closing argument. Moreover, in order to maintain some credibility with the jury, Sammons was required to acknowledge the obvious differences between his trial strategy and that proposed by his client.[19] Consequently, his statements that the trial had become "bizarre" and that he and Emerson had some disagreements were merely attempts to gain credibility before the jury, and did not impair his client's plea of not guilty.

▮ The remainder of counsel's remarks in closing are more problematic. It is true that an attorney cannot admit his client's guilt without first obtaining his consent. *See United States v. Simone,* 931 F.2d 1186, 1196 (7th Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991). However, it is not necessarily error for counsel to admit that the evidence against his client on a particular count is overwhelming. *See Underwood v. Clark,* 939 F.2d 473, 474 (7th Cir.1991) (counsel permitted to acknowledge abundance of evidence against client on lesser count when doing so would highlight absence of evidence on more serious count). Counsel's recognition of evidence against his client, so long it is part of a rational trial strategy, will not be considered ineffective

---

**18.** Moreover, this is not a case where counsel failed to present the only plausible defense available to the defendant. *See, e.g., Sanders v. Ratelle,* 21 F.3d 1446, 1459 (9th Cir.1994) (counsel failed to base defense on mistaken identity and declined to present confession of another person); *United States v. Kladouris,* 739 F.Supp. 1221, 1228 (N.D.Ill.1990) (counsel failed to present only available defense of justification). Rather, counsel conducted the trial consistent with the theory that Ray was actually responsible for Byrd's death.

**19.** Indeed, Sammons was forced to conduct much of the trial without the presence of his client at counsel's table, because Emerson refused to participate in the proceedings and insisted on viewing the trial from the holding area in the rear of the courtroom. Such conduct certainly hampered Sammons's ability to make an effective presentation to the jury.

assistance, even if the client is not consulted. *Id.*

■ Sammons argued in closing that the facts did not support the State's contention that the two people who entered Ray's apartment that night intended to commit armed robbery. He focused on Ray's testimony that Emerson had told him on the night of the murder that he would meet him at the saloon, and that Emerson supposedly permitted Ray to leave the tavern and get some cigarettes. Sammons then asked the jury to return a verdict of not guilty with regard to the armed robbery counts, saying "[i]f this was a murder, it was a murder." He concluded his argument by saying that all he was asking the jury to do was find Emerson not guilty of armed robbery. Emerson contends that these remarks effectively undermined his plea of not guilty to the murder charge against him.

Given the problematic situation in which Sammons was placed by the actions of his client, and the remarkable evidence which was presented by Jackson, we conclude that Sammons conducted his closing argument according to the professional dictates of the Sixth Amendment. Counsel's original theory—that Ray had concocted the entire story—was seriously undermined by Jackson's testimony, since the vast majority of Ray's testimony was corroborated by Jackson. While Sammons could have argued that Jackson's testimony showed that Ray incorrectly identified Emerson, it would have required Sammons to credit portions of Ray's testimony at the same time he was discrediting others. Emerson maintains that Sammons could have stressed the lack of fingerprints connecting him to the crime, but this would not have been persuasive since much of the building had been destroyed by the fire. Instead, Sammons focused on the armed robbery charge in the hope of affecting Emerson's eligibility for the death penalty. As noted by the Illinois Supreme Court on direct appeal, this theory was not perfect, since the underlying felony need not have

been completed, proven or even charged by the government in order for a defendant to be found guilty of felony murder. *See People v. Emerson*, 122 Ill.2d 411, 119 Ill.2d 250, 258, 522 N.E.2d 1109, 1117 (1987) (quoting *People v. Walker*, 91 Ill.2d 502, 64 Ill.Dec. 531, 536, 440 N.E.2d 83, 88 (1982)). However, had Sammons been able to persuade the jury to acquit Emerson of armed robbery, he could have defeated the felony murder charge and a potential death sentence. *See People v. Harris*, 132 Ill.2d 366, 138 Ill.Dec. 620, 631, 547 N.E.2d 1241, 1252 (1989), *cert. denied*, 496 U.S. 908, 110 S.Ct. 2594, 110 L.Ed.2d 275 (1990). Sammons's comment on the evidence dealing with the murder charge was therefore rational, given that such evidence overwhelmingly pointed to Emerson as the attacker and Sammons was trying to save his client from the death penalty.[20] To be sure, Sammons's closing was not particularly persuasive, since he only chose to challenge the State's contention that Emerson went to the Lounge with the intent to commit armed robbery. However, due to the damning evidence given by Ray, the physical evidence supporting his version of the events, and Jackson's corroboration of most of it, Sammons did not have much room in which to maneuver. While not an optimal presentation, Sammons's closing was rational given the evidence presented at trial and Emerson's potential penalty, and therefore did not constitute deficient performance.

Additionally, Emerson has failed to demonstrate prejudice resulting from this closing argument. In order to succeed on his claim petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *see also Lockhart v. Fretwell*, —— U.S. ——, ——, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993) (proceeding must be fundamentally unfair or unreliable to amount to prejudice). In this case, any other closing that Sammons

---

**20.** The instant case does not exactly parallel *Underwood*, as Sammons was arguing for acquittal on the lesser charge rather than the more severe one. Nonetheless, the reasoning of *Underwood* applies here because counsel sought to contrast the evidence which existed on the murder count with the conflicting evidence on the armed robbery count in order to reduce Emerson's exposure to the more severe penalty.

could have made would not have sheltered his client from the thoroughly damning evidence against him. Although petitioner claims that he was only implicated because of Ray's biased testimony, this testimony was corroborated by both physical evidence (e.g., Byrd's body was found in the airshaft, the door locking mechanism found just as Ray had described it, etc.) and Emerson's own witness.

Emerson also contends that because the evidence at the first trial was so close as to require reversal upon the finding of certain minor trial errors, the evidence at the second trial must also have been near equilibrium. Not so. At his first trial Emerson himself testified that he was not at the Lounge on the night in question, while in the second trial only his brother testified as to petitioner's absence. Given that Emerson did not take the stand in the second trial, and thus Ray's testimony was only challenged by the dubious testimony Jackson gave (after the State had rested in its case against him), the evidence facing Emerson at his second trial was much stronger than at the first. In sum, we do not find that the evidence at the second trial was so close as to render Sammons's closing argument prejudicial.

5. Failure to Object to State's Closing

▪ Petitioner claims that Sammons was also deficient in failing to object to the State's closing argument and its rebuttal. In general, the decision of whether to object to a prosecutor's closing argument is considered a matter of trial strategy. *See United States v. Driver,* 798 F.2d 248, 255 (7th Cir.1986). Only where the evidence is obviously objectionable and thoroughly inculpating have courts based a finding of ineffectiveness on a failure to object. *See, e.g., Bolander v. Iowa,* 978 F.2d 1079, 1083 (8th Cir.1992). In the instant case, closing argument by the state's attorney did not violate the ethical rule against offering a personal belief or opinion on testimony, *see* ABA Rules of Professional Conduct 3.4(e); ABA Standards for Criminal Justice 3–5.8(b), but rather, sought to point out the strengths and weaknesses in the credibility of the various witnesses. In the context of his entire argument, the prosecutor's contention that Jackson's testimony was a "bizarre sham," bordering on perjury, was nothing more than argument as to why the State's version should be believed. As the prosecutor did not interject personal opinion, there would have been no grounds for Sammons to object. Moreover, Emerson has failed to demonstrate any prejudice resulting from this alleged error. Accordingly, this claim is denied.

6. Miscellaneous Errors

▪ Emerson also makes two additional arguments as to why Sammons provided deficient assistance. First, he claims that Sammons demonstrated antagonism towards his client when Ms. Jackson was called to the stand, as well as during his closing argument. While these two instances did indicate to the jury that friction existed between Emerson and his lawyer, they were not so serious as to implicate the Sixth Amendment. Indeed, Sammons's statement during closing argument was apparently intended to establish some credibility with the jury, and was therefore a rational matter of trial strategy.

▪ Second, petitioner contends that the cumulative effect of all of Sammons's trial errors was to deprive him of effective assistance. While it is true that a collection of harmless errors, when considered in concert, may nonetheless amount to a violation of the Sixth Amendment, *see Kubat v. Thieret,* 867 F.2d 351, 357 (7th Cir.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989); *United States v. Kladouris,* 739 F.Supp. 1221, 1230 (N.D.Ill.1990), we are not faced with such a scenario. Rather, counsel in the instant case had available the transcript from the first trial to assess possible theories and witnesses; no additional evidence was to be presented by the State; Emerson was not going to testify, thereby preventing the State from inquiring into the circumstances of his arrest; and Emerson's brother presented incredible testimony that had never been previously presented and contradicted his own defense. In evaluating Sammons's conduct in the context of these events, we cannot conclude that the combined effect of his performance was to deprive petitioner of his constitutional rights.

In sum, petitioner has failed to satisfy his heavy burden of demonstrating that Sammons provided him with ineffective assistance during the guilt-innocence phase of his trial. Accordingly, these habeas corpus claims are denied.[21]

## C. Ineffective Assistance at Sentencing

■ The Sixth Amendment also requires that defendants receive the assistance of counsel during sentencing. In order to prevail on a claim of ineffective assistance, "[a] defendant must demonstrate (1) that his representation at sentencing fell below an objective standard of reasonableness and (2) that a reasonable probability exists that, but for his attorney's unprofessional representation, the result of the proceeding would have been different." *Ebbole v. United States*, 8 F.3d 530, 533 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1229, 127 L.Ed.2d 573 (1994); *see Strickland*, 466 U.S. at 687–88, 104 S.Ct. at 2064–65. In the context of a death penalty hearing, the second prong is satisfied if there was a reasonable probability that at least one juror would be sufficiently influenced by mitigation evidence to vote against the imposition of the death penalty. *See Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir.), *cert. denied*, 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). As with the application of *Strickland* to the guilt-innocence phase, we need not continue our analysis if petitioner fails to satisfy either prong. *Ebbole*, 8 F.3d at 533.

■ Emerson contends that Sammons failed to conduct any investigation or preparation into possible mitigation evidence, and failed to present any evidence at the sentencing phase, in contravention of his obligation to provide effective assistance of counsel. The Seventh Circuit has mandated that

> defense counsel must make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors. Mitigating factors brought out at trial might be emphasized, a coherent plea of mercy might be given, or new evidence in mitigation might be presented. But counsel may not treat the sentencing phase as nothing more than a mere postscript to trial.

*Kubat*, 867 F.2d at 369. In support of his lack of investigation argument, petitioner points to the absence of any notes or other preparatory materials in the Public Defender case file. He also introduces affidavits from his family members stating that they were not contacted by Sammons about presenting possible mitigation evidence, as well as his own affidavit indicating that Sammons failed to discuss with him any possible sources of mitigation. In his deposition Sammons either fails to remember conducting any specific investigation[22] or admits that he prepared nothing before the conclusion of the guilt-innocence phase of the trial.[23] Respondent essentially concedes the issue of deficient representation with regard to Sammons's preparation, focusing instead on any prejudice his performance may have caused. After a thorough review of the trial court transcript and Sammons's deposition, we conclude that Sammons's failure to conduct any

---

**21.** Petitioner's request for an evidentiary hearing is denied, since all relevant factual issues have been adequately developed either through the state court proceedings or Sammons's deposition in the instant case. *See United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1139 (7th Cir.1990). Emerson claims that we must hold a hearing to determine whether Sammons actually had the theory respondent contends he did. We disagree. First, we need not concern ourselves with the Sammons's subjective state of mind in August 1979, since we have found his performance to be consistent with a rational theory of the case. Second, due to the lapse of time since the trial, and the attendant failure of memories, an evidentiary hearing would provide little assistance in resolving the issues raised by petitioner.

**22.** Sammons Dep. at 301–12.

**23.** Q: Had you done any work with respect to developing a case of mitigation in the event Mr. Emerson was found guilty between the commencement of the trial, I've already asked you about that, and up until [the State rested]? Was there any ongoing work to prepare a case in mitigation?
A: No more than to—no more than perhaps discussing that with Mr. Brady or the other— the prosecutors, but *no investigation, no work, no witnesses*.
Sammons Dep. at 256 (emphasis added).

meaningful investigation into potential mitigation evidence constituted deficient representation. While it is true that counsel had the benefit of a transcript of the first death penalty hearing, there was no evidence of mitigation presented in the first case so this testimony was of little value. Although Sammons claims that he reviewed Emerson's criminal record in order to ascertain what aggravating evidence would be introduced, this does not constitute sufficient preparation for a death penalty hearing. Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, *see* 720 ILCS 5/9–1(c), (e) (no limitation on possible mitigating factors and rules of evidence do not apply), counsel is under a greater obligation to discover and evaluate potential evidence of mitigation. Moreover, the death penalty phase "may be the stage of the proceedings where counsel can do his or her client the most good." *Kubat,* 867 F.2d at 369. Therefore, prior to the sentencing phase, an attorney representing a capital defendant must undertake a reasonable investigation—constituting more than simply reviewing the transcript of a prior hearing and the criminal record of the defendant—into potential aggravating and mitigating evidence. *See Brewer v. Aiken,* 935 F.2d 850, 857 (7th Cir.1991); *cf. Martinez–Macias v. Collins,* 810 F.Supp. 782, 817–18 (W.D.Tex.1991) (decision to forgo interviewing family members, without knowledge of what they would say, was neither tactical nor reasonable), *aff'd,* 979 F.2d 1067 (5th Cir.1992); *Gaines v. Thieret,* 665 F.Supp. 1342, 1362–71 (N.D.Ill.1987) (eight hours preparation between guilt-innocence phase and sentencing phase insufficient), *aff'd in part, rev'd in part on other grounds,* 846 F.2d 402 (7th Cir.1988). Although we recognize the extreme time pressures placed upon public defenders, and the speed with which the instant case went to trial after Sammons was appointed, such concerns do not outweigh a capital defendant's right to

have his attorney conduct the necessary preparation before sentencing. As the evidence shows that Sammons failed to perform such investigation, we find his performance deficient.

We next address Sammons's failure to present mitigation evidence to the jury during the aggravation-mitigation phase of sentencing. The State presented an opening statement wherein it characterized Emerson as a horrible and vicious individual who demonstrated no redeeming qualities whatsoever; Sammons did not make an opening statement. In presenting its case for imposition of the death penalty, the State introduced certified copies of Emerson's seven prior felony convictions, all involving theft or armed robbery. Sammons objected to some of these documents, but his protestations were overruled. The State also presented additional evidence concerning petitioner's prior armed robberies, including testimony from one of the victims, two police officers who had arrested him, and a prosecutor who obtained a conviction against him. During this testimony, Sammons asked only one immaterial question in cross-examination. At the close of the state's case Sammons declined to introduce any mitigating evidence, and submitted the case to the jury without argument. It is clear from the record that at this point in the proceedings, the jury had no option other than to impose the death penalty. No evidence in mitigation had been presented during the sentencing phase, and none of the testimony from the guilt-innocence phase could have supplied mitigating information about Emerson.[24]

■ Respondent argues that Sammons's complete failure to present mitigating evidence was the result of Emerson's knowing decision to follow that route. The State points to numerous portions of the transcript wherein Emerson states that he does not want Sammons to act on his behalf. In particular, respondent quotes a colloquy between the trial judge and Emerson in which Emerson indicated that he did not want to

---

**24.** Although petitioner's mother had been placed on the stand during the guilt-innocence phase, she was not asked any questions by Sammons. This damaged petitioner's case more than if Ms.

Jackson had not been present at the trial, since "it could only appear to the jury that even his mother had nothing good to say about him." *Gaines,* 665 F.Supp. at 1366.

present any evidence in mitigation. Trial Rec., Vol. III at 584–85. In general, a defendant cannot complain that his attorney was ineffective simply because the trial strategy chosen by the defendant led to an undesirable result. *See United State v. Kamel*, 965 F.2d 484, 497 (7th Cir.1992). However, when counsel has failed to conduct a reasonable investigation into possibly mitigating evidence, he cannot possibly advise his client as to the propriety of a particular course of action. *See Blanco v. Singletary*, 943 F.2d 1477, 1501 (11th Cir.1991) ("Counsel essentially acquiesced in [defendant's] defeatism without knowing what evidence [defendant] was foregoing. Counsel therefore could not have advised [defendant] fully as to the consequences of his choice not to put on any mitigation evidence."), *cert. denied*, 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992). In this case, there is no indication that Sammons alerted Emerson to the fact that unless he presented some mitigating evidence, a death sentence was certain. Moreover, Sammons was incapable of adequately advising Emerson as to value of potentially mitigating evidence, since he had conducted no investigation. Consequently, Emerson's decision to forego the presentation of evidence at the sentencing hearing cannot be viewed as simply a matter of trial strategy. Given that Emerson faced an almost certain sentence of death, counsel was remiss in not presenting some evidence of mitigation on his behalf, and his failure to do so constituted deficient performance.

In order to prevail on his petition, however, Emerson must also show that he was prejudiced by this failure to investigate and present mitigation evidence. In other words, Emerson must demonstrate a reasonable probability that the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Brewer*, 935 F.2d at 858 (quoting *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069). Petitioner maintains that had Sammons conducted an investigation, he could have uncovered at least seven potential witnesses who would have provided mitigating evidence.[25] He claims that one or more of these witnesses, as well as the social worker that he has retained as an expert witness, could have testified as to the following information. At age eight Emerson was shot when he was an innocent bystander to a grocery store robbery, and was prevented from finishing out the school year because his injuries. After this incident Emerson claims that he began a period of extensive truancy, thereby inhibiting his educational development. Emerson was forced to live at several juvenile institutions over the next few years because of his truancy. He was evaluated as having an IQ of between 80–87, which his expert witness characterizes as between dull normal and borderline retarded. While at these institutions petitioner was repeatedly recommended for special services and counselling, but most often these services were not provided to him. Case workers dealing with Emerson concluded that he had no positive male role models in his life, had suffered from emotional neglect, and had not developed the skills necessary for him to live independently. Several of these witnesses could have testified that petitioner was a kind-hearted individual, who tried to take care of his family. Emerson at one point in his life fathered a baby girl, whom he cared for in part until her death at age seven months. Petitioner claims that he was emotionally devastated by her death.

■ Respondent challenges the relevance and strength of much of this evidence. First, it argues that many of the witnesses were family members whose testimony would be of little value because of bias. While we agree that bias would exist, this does not mean that such testimony can never be relevant or useful in determining a defendant's sentence. *See Blanco*, 943 F.2d at 1505 (prejudice resulted from not presenting mitigation evidence from relatives). Second, the state contends that petitioner's history of truancy indicates not an inability to perform well at

---

25. These witnesses were Emerson's mother (Ms. Jessie Jackson), his cousin (Pat Thompson), his brother (Ricky Jackson), a longtime friend (Louella Gunn), a former girlfriend (Oliva Guye), and two prison ministry workers (Jana Minor and Sister Miriam Wilson). These last two witnesses knew Emerson prior to his second trial, and would be able to testify as to the positive attributes he demonstrated while incarcerated.

school, but a conscious desire to avoid it. However, this theory neglects to account for the contention that Emerson's troubles with school began when he was shot during a robbery, suggesting that his problem with school may be more complicated than simply rebelliousness. Third, respondent argues that petitioner's IQ is not relevant because it is not sufficiently low enough to characterize him as mentally retarded. While this classification of petitioner is correct, the Illinois death penalty statute does not require a defendant to be mentally retarded in order for him to present evidence of his IQ in mitigation. Rather, a jury could rationally consider evidence of the diminished mental capacity of a defendant who is not mentally retarded when determining the appropriate sentence. Cf. *Brewer*, 935 F.2d at 857–59. Finally, respondent maintains that allowing petitioner's expert witness to testify as to her evaluation of Emerson's experiences would also open the door to a detailed chronicle of petitioner's extensive criminal and behavioral problems. Notwithstanding the accuracy of this statement, we do not believe that it defeats petitioner's claim. Considering that the evaluation outlined Emerson's problematic childhood and development in great detail, and provided a rational explanation as to how these problems facilitated his development into a criminal, a juror might well have given greater weight to these factors than to his criminal history.[26]

Taking all of this evidence together, we are left with the conviction that a reasonable probability exists that at least one juror would have found such mitigation evidence sufficient to preclude the imposition of the death penalty. Being a victim of a violent attack at age eight, lacking emotional and educational support from his parents, losing a young child, and having a diminished IQ are all significant pieces of mitigation evidence which could have altered the jury's decision as to Emerson's culpability. *See*

*Brewer*, 935 F.2d at 857–59 (habeas petitioner with diminished IQ, troubled childhood, deprived background and other psychiatric problems prejudiced by failure to present such evidence in mitigation). Testimony as to the care Emerson gave to his family and daughter could have humanized him before the jury and potentially persuaded at least one of them that Emerson was not the vicious killer portrayed by the State. *See Martinez–Macias*, 810 F.Supp. at 816–17 (prejudicial not to present evidence that habeas petitioner was good father and family man). Sammons's failure to present a closing argument compounded these errors, as the jury was left with the impression that no one—not even his lawyer—thought his life was worth saving. In sum, a reasonable probability exists that the information could have persuaded at least one juror not to impose the death penalty. Because none of this mitigating evidence was presented at the first hearing, our confidence in the fairness and reliability of the original sentencing has been seriously undermined. *See Lockhart*, —— U.S. at ——, 113 S.Ct. at 842. Accordingly, we grant petitioner's motion for habeas corpus and order that he be resentenced.

### D. Constitutionality of Illinois Death Penalty Statute

Petitioner also argues that he was sentenced under an unconstitutional sentencing scheme. First, he contends that the unbridled discretion of prosecutors in seeking the death penalty leads to its "arbitrary, capricious, and freakish imposition." Second, he asserts that because the State need not declare its request to seek the death penalty until after the guilt-innocence phase of the trial, the scheme violates defendants' rights to due process of law. Third, petitioner contends that this lack of pretrial notice also hampers the preparation of a meaningful strategy by a lawyer, thereby violating the

---

**26.** Respondent cites *Resnover* in support of its contention that the report could only have harmed Emerson. However, the *Resnover* court's discussion of introducing criminal history though mitigation witnesses was directed only towards the deficiency prong of *Strickland*, not prejudice. *Resnover*, 965 F.2d at 1460. In that case, counsel made the rational decision to plead for his client's life rather than have his father testify in mitigation. Here, counsel did not make a rational decision to avoid the disclosure of petitioner's criminal history, but rather, failed to conduct any investigation into the utility of mitigation evidence and declined to make any sort of argument in mitigation.

right to effective assistance of counsel. In addition to the fact that at least some of these arguments may have been waived in the state courts, all three of them have been repeatedly rejected by the Seventh Circuit. *See, e.g., Williams v. Chrans,* 945 F.2d 926, 938–39 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992); *Silagy v. Peters,* 905 F.2d 986, 990–97 (7th Cir.1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). Moreover, the Supreme Court has upheld similar death penalty statutes in the past. *See, e.g., Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976). In the interest of limiting the length of this opus, we deny Emerson's claims for the reasons stated in those opinions.

### III. Conclusion

For the reasons set forth above, Emerson's petition for habeas corpus is granted with regard to his sentence of death and denied in all other respects. The state is ordered to resentence petitioner pursuant to the dictates of the Sixth Amendment within 120 days of the date of this order. It is so ordered.