978 F.2d 1079
 Michael T. BOLANDER, Appellee,
v.
STATE OF IOWA, Appellant.
 No. 91-3789.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 9, 1992.
Decided Nov. 5, 1992.
Rehearing and Rehearing En Banc
Denied Dec. 21, 1992.
 
 Thomas D. McGrane, Des Moines, Iowa, argued, for appellant.
 Paul H. Rosenberg, Des Moines, Iowa, argued, for appellee.
 Before WOLLMAN, Circuit Judge, BRIGHT and ROSS, Senior Circuit Judges.
 BRIGHT, Senior Circuit Judge.
 
 
 1
 The State of Iowa appeals from the district court[1] order granting Michael T. Bolander, who was previously convicted of first-degree murder in the State of Iowa, habeas corpus relief under 28 U.S.C. § 2254 (1988). The district court determined that Bolander's attorney failed to provide competent assistance, which prejudiced Bolander. The district court directed that the State of Iowa release Bolander, retry him, or reduce his conviction to second-degree murder. We affirm.
 
 I.
 
 2
 Early on the morning of April 10, 1983, Orval Stiles, Jr., was stabbed to death in his home in Council Bluffs, Iowa. Orval Stiles was sixty-one years old and had recently retired from his position as a computer analyst for the Omaha Public Power District. He had been married to Edna Marie Stiles for forty years. They had raised five children in the family home, where they had lived together for the past thirty years.
 
 
 3
 Despite their long marriage, Orval and Edna maintained an unusual relationship. They did not get along with one another and argued frequently. As a solution to the domestic unrest, Orval had moved into his youngest child's bedroom after she left home in 1980. After this move, Orval lived almost completely apart from Edna, locking himself into the bedroom by inserting a knife in the doorjamb. One of the Stiles's children stated that without entering Orval's bedroom, a visitor would not know that a man lived in the house.
 
 
 4
 On the other hand, Edna Stiles, sixty years old in April of 1983, lived an active life outside of the discordant home. Three or four times a week she went to Omaha bars to dance, drink, and meet men. On these occasions, Edna held herself out as a single woman named "Marie." She did not attempt to conceal her male companions from Orval and often received calls at home from them. During the months leading up to Orval's death, Edna increasingly talked about either filing for divorce or Orval moving out. At one point, she had consulted an attorney about filing for divorce, but desisted when she learned it might not be in her best financial interest. Edna had no outside employment, although she did sell cosmetics from her home.
 
 
 5
 While out one evening at an Omaha bar, Edna met twenty-four-year-old Michael Bolander. Known as "Hobo" to his friends, Bolander had not experienced much success in life. He had been expelled from the technical school he was attending and just days before the events in question had been evicted from his apartment for not paying rent. He earned forty dollars per week working at a laundromat. A self-admitted alcohol and drug abuser, Bolander satisfied his alcohol habit by working at night as a bouncer at Andy's Ark Bar, where he was paid with drinks. Bolander took advantage of his opportunity as a bouncer at Andy's Ark Bar to meet and date a number of women.
 
 
 6
 During a conversation on Thursday, April 7, 1983, Bolander and Edna arranged a date for Saturday, April 9. Also during this conversation, Edna told Bolander she had been held hostage and beaten by her husband, son and daughter-in-law during a four-hour ordeal in the family home the previous November.
 
 
 7
 As planned, Bolander and Edna met at Andy's Ark Bar on April 9. They had dinner and drinks, and went dancing. After later having breakfast together, the two drove to the Stiles home.
 
 
 8
 Orval Stiles placed a 911 emergency telephone call at 2:28 a.m. on April 10. An emergency unit was dispatched to the Stiles home, where police found Orval lying on the floor suffering from severe knife wounds. They also found a hysterical Edna, her hands loosely tied behind her back with a cloth towel. The emergency medical team tried unsuccessfully to revive Orval, who was pronounced dead a short time later as a result of the knife wounds. An autopsy revealed that Orval had received a penetrating wound to the chest that punctured his heart and a severe laceration to the stomach, from which his intestines protruded.
 
 
 9
 Edna was initially questioned at the Stiles residence. She told the police that on the eve of her husband's death she went to the Walking Cane Bar by herself, then to the Leavenworth Cafe for breakfast by herself, and then returned to her home by herself. Upon arriving home, she was grabbed by an unknown man, who tied her up and stabbed her husband. After giving this initial statement, Edna was taken to police headquarters, where she gave two tape-recorded statements. In her first taped statement, she indicated that she went to the Walking Cane Bar by herself, saw Bolander, danced and had breakfast with him, and then went home alone. In her second statement, which is the focus of this appeal, Edna said that she picked up Bolander at Andy's Ark Bar. They had dinner together, went dancing and drinking at the Walking Cane Bar, and then had breakfast at the Leavenworth Cafe. When asked where she went after leaving the Leavenworth Cafe, Edna stated:
 
 
 10
 ANSWER (Edna Stiles): Well I drove him [Bolander] over to Council Bluffs and then he said since I have been treated so terrible he didn't want anybody treating me like that again. He said cause I was such a nice person to be treated that way and he said he was going to fix my husband's car up and I do not know what he meant by that.
 
 
 11
 QUESTION: A huh.
 
 
 12
 ANSWER: And then he said to drop him off about a block from my house which I did. And I drove in my driveway by myself and I unlocked the door and I didn't know for sure if he was coming in the house, I didn't know this for sure, I guess he had planned that he would tie me up and make it look like a burglary and a so I opened the front door, went into the kitchen, turned the light on and went into the kitchen.
 
 
 13
 QUESTION: Now he told you these things as you were driving over?
 
 
 14
 ANSWER: Yes.
 
 
 15
 QUESTION: To Council Bluffs?
 
 
 16
 ANSWER: And he said he would fix my husband up and what he meant by that I do not know and I said don't hurt him.
 
 
 17
 QUESTION: He told you he was going to fix your husband up?
 
 
 18
 ANSWER: Fix him up.
 
 QUESTION: And fix your husband's
 
 19
 ANSWER: Gonna fix him up and then he was going to take his car and leave and I said don't hurt my husband.
 
 
 20
 QUESTION: And he told you he was going to tie you up to make it look like a burglary?
 
 
 21
 ANSWER: Yes. Yes.
 
 
 22
 ....
 
 
 23
 QUESTION: Okay ... on the way over from [sic] to your house from Omaha Mike Bollander [sic] told you that he was going to fix your husband's car and fix your husband and that he was going to tie you up and make it look like a burglary, is that right?
 
 
 24
 ANSWER: A huh, yes.
 
 
 25
 QUESTION: And then a you dropped a him off about a block from your house and then you drove on home?
 
 
 26
 ANSWER: Yes.
 
 
 27
 QUESTION: And you went in [the house] and he followed you in the door?
 
 
 28
 ANSWER: Yes.
 
 
 29
 QUESTION: And he tied you up ... tied you up in the kitchen?
 
 
 30
 ANSWER: Yes.
 
 
 31
 QUESTION: And then he went down to your husband's bedroom and your husband came out and a had a gun and he picked up the telephone and called 911?
 
 
 32
 ANSWER: Yes.
 
 
 33
 QUESTION: And then he [Mr. Stiles] fired some shots down the hallway towards the bedroom?
 
 
 34
 ANSWER: Yes.QUESTION: And then Bollander [sic] came out a from that end of the house and him and your husband were scuffling in the living room?
 
 
 35
 ANSWER: Yes.
 
 
 36
 QUESTION: And then a, then Bollander [sic] ran out the door, is that right?
 
 
 37
 ANSWER: Yes.
 
 
 38
 Transcript of Second Statement of Edna Marie Stiles.
 
 
 39
 During the morning of April 10, the police went to the apartment in Omaha where Bolander was staying. Initially, Bolander denied having any knowledge of the stabbing. After being arrested and given the Miranda warnings, however, Bolander gave a taped statement. He stated that he had been out the night before on a date with Edna (although he knew her by her middle name "Marie"). After their date, he drove her home, intending to rob her. When they arrived at the Stiles home, he tied her up, but she screamed while he was doing so. After tying up Edna, Bolander was surprised by Orval Stiles, who came out of his bedroom carrying a handgun. Bolander struggled with Orval on the floor and attempted to free himself from Orval's grasp. After freeing himself, Bolander ran out of the house and walked back to the apartment where he was staying.
 
 
 40
 Bolander had a four-inch folding Buck knife in his possession when the police arrived to question him, and he admitted that he had been carrying the knife while at the Stiles home, however Bolander could not remember stabbing Orval.
 
 
 41
 The police found a .22 caliber handgun near Orval's body. Orval kept the gun, which was loaded with blanks, in the house so he could scare off intruders. Only one of the nine blank cartridges in the gun had been fired. Testing revealed the gun had been fired in close proximity to both Orval and Bolander. A plunger handle with a small deposit of blood on it was also found in the home. From the fact that the table knife Orval used to lock the door was bent, the police determined the door to Orval's bedroom had been forced open. In addition, the 911 service possessed a tape of the phone call placed by Orval for help. Although the entire conflict was recorded, most of the words are unintelligible and drowned out by Edna's screaming and a dog's barking.
 
 
 42
 Bolander and Edna were charged with the first-degree murder of Orval Stiles, Jr. On the basis of planned statements and admissions of Edna Stiles, Bolander's attorney filed a motion for a separate trial. The trial court granted the motion to avoid a classic Bruton problem. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In a separate trial, Edna was found guilty of second-degree murder.
 
 
 43
 At trial, Bolander claimed he had acted in self-defense. Changing his original story, he testified he had accompanied Edna home, expecting to have a couple of drinks and possibly engage in sexual relations. While the two were kissing and talking, Bolander heard a noise from a bedroom where Edna kept her dog. He picked up a bathroom plunger handle and went to investigate the noise. He was then confronted by Orval, who had a gun, and a struggle ensued. Bolander remembered hitting Orval with the plunger handle, but again could not remember stabbing him with the knife.
 
 
 44
 Both of Edna's taped statements were played for the jury, and the tapes and a transcript were admitted into evidence. Bolander's trial counsel did not object to the admission of either statement.
 
 
 45
 The jury found Bolander guilty of first-degree murder. The Iowa Supreme Court affirmed the conviction on direct appeal, and Bolander subsequently exhausted all state collateral post-conviction remedies. He then filed a federal habeas petition alleging, inter alia, that his constitutional right to effective counsel was violated because his counsel failed to object to the admission of Edna's second taped statement as inadmissible hearsay.
 
 
 46
 The magistrate judge recommended that Bolander be denied habeas relief. He did not address whether Bolander's trial counsel's performance was deficient for failing to object to the admission of Edna's statement. He reasoned that even if counsel's performance was deficient, Bolander had failed, because of the weight of the other evidence in the case, to establish the requisite degree of prejudice under the standard enunciated in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).
 
 
 47
 The district court disagreed. After holding that "trial counsel's failure to object to the admissibility of Mrs. Stiles' second statement was clearly deficient," the district court concluded that Bolander had satisfied the Strickland prejudice requirement. District Court Memorandum Opinion and Order Granting Writ of Habeas Corpus at 3. Specifically, the district court held that although Bolander had failed to establish his innocence, he had shown a "reasonable probability that he would not have been convicted of ... first degree murder." Id. at 3-4. The district court observed that Edna's second statement, particularly the part in which she said that Bolander had told her that he would fix her husband up, "provided the only direct evidence of premeditation, an essential element of first degree murder." Id. at 4. The circumstantial evidence from which the jury could have convicted Bolander of first-degree murder was not conclusive and permitted a reasonable doubt as to premeditation. Id. The district court therefore granted Bolander's habeas petition and ordered the State to take one of three steps: release Bolander, retry him, or reduce his conviction to second-degree murder.
 
 
 48
 The State appealed, arguing the district court placed too little weight on the circumstantial evidence presented at trial and too much weight on Edna Stiles's statement. The State contends that although the second statement was the only direct evidence of premeditation, circumstantial evidence is as probative as direct evidence, State v. O'Connell, 275 N.W.2d 197, 204-05 (Iowa 1979), and, more specifically, can establish premeditation. State v. Freie, 335 N.W.2d 169, 172 (Iowa 1983). The State thus contends that, based on all the circumstantial evidence presented at trial, the jury would have found premeditation and convicted Bolander of first-degree murder absent the introduction of the second statement.
 
 
 49
 Bolander in turn argues that in granting him a separate trial, the trial court had already determined that Edna's statement would be prejudicial. He contends it is inconsistent to permit the State to rely on the statement in seeking a first-degree murder conviction and then claim the statement lacks probative weight. Finally, he argues the district court adequately considered the circumstantial evidence, which was inconclusive regarding premeditation.
 
 II.
 
 50
 To establish a claim of ineffective assistance of counsel, a defendant must show trial counsel's performance was deficient and the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." Id. at 698, 104 S.Ct. at 2070. Accordingly, we engage in an independent review of the district court's conclusion, while reviewing the district court's findings of fact under the clearly erroneous standard. Smith v. Lockhart, 946 F.2d 1392, 1394 (8th Cir.1991).
 
 
 51
 The State does not argue that trial counsel's performance was not deficient; rather, it maintains the district court erred in finding that Bolander demonstrated the requisite degree of prejudice. To demonstrate prejudice under Strickland, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. This standard is not outcome-determinative. Id. at 693, 104 S.Ct. at 2067. Given the breakdown of adversarial proceedings inherent in an ineffective assistance claim, "finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id. at 694, 104 S.Ct. at 2068. The question, then, is whether Bolander has shown a reasonable probability that, absent the admission of Edna Stiles's second statement, the jury would have had a reasonable doubt respecting Bolander's culpability for first-degree murder. Id. at 695, 104 S.Ct. at 2069.
 
 
 52
 In deciding whether an error by counsel prejudiced a defendant, we must be guided by "the fundamental fairness of the proceeding whose result is being challenged." Id. at 696, 104 S.Ct. at 2069. In granting the motion for a separate trial, the trial judge stated "testimony will be introduced concerning statements and admissions made by the Co-Defendant Edna Stiles which would work prejudicially with a jury against this Defendant." State v. Bolander, No. 83-1333, App. at 6 (Iowa Sup.Ct. June 20, 1983) (Motion for a Separate Trial). Thus, the unfair prejudice had been judicially recognized early in this case.
 
 
 53
 Our determination of prejudice to Bolander "must consider the totality of the evidence before the ... jury." Strickland, 466 U.S. at 695, 104 S.Ct. at 2069. We agree with Judge Vietor that the evidence is such as to support a conviction of second-degree murder. We also support his conclusion that without Edna's statement, the circumstantial evidence permits a reasonable doubt as to the premeditation necessary to support a first-degree murder conviction. The State emphasizes the circumstantial evidence against Bolander. As the district court observed, the circumstantial evidence is legally sufficient to support a finding of premeditation, but the evidence also permits a reasonable doubt. Initially, Bolander attacked Orval with a wooden plunger handle. Orval was armed with a handgun, which he fired once in the course of the struggle. The circumstantial evidence permits several interpretations of the events in question. Some interpretations would lead to a conviction of first-degree murder; others of second-degree murder. The variety of inferences from the evidence in the record possible without Edna's statement require a determination that the statement was prejudicial to Bolander.
 
 
 54
 We thus agree with the district court that Edna's statement provided the only direct evidence of premeditation and the circumstantial evidence taken as a whole permits a reasonable doubt as to Bolander's premeditation. Accordingly, we affirm the order granting Bolander habeas relief.
 
 
 55
 WOLLMAN, Circuit Judge, dissenting.
 
 
 56
 I respectfully disagree with the majority's finding that Bolander has established prejudice as defined in Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).
 
 
 57
 The majority's reliance on the trial court's pretrial determination of prejudice is misplaced. The majority observes that the trial judge, in granting Bolander's motion for a separate trial, stated that "testimony will be introduced concerning statements and admissions made by the Co-Defendant Edna Stiles which would work prejudicially with a jury against this Defendant." See majority opinion supra p. 1084 (quoting State v. Bolander, No. 83-1333, App. at 6 (Iowa Sup.Ct. June 20, 1983)). The majority thus concludes that "unfair prejudice had been judicially recognized early in this case." Id.
 
 
 58
 In reaching its conclusion, the majority mistakenly equates the trial judge's use of the word "prejudicially" with the Supreme Court's use of the word "prejudice" in Strickland. The trial judge, however, was not using "prejudicially" as the adverbial form of "prejudice" as specifically defined in Strickland, but rather in the generic sense of the word, meaning adversely or detrimentally.
 
 
 59
 Moreover, the majority fails to recognize the problem of relying on a finding of prejudice made "early in this case." When we decide whether an error by counsel prejudiced a defendant, our task is to examine all the evidence presented at trial and then determine whether the defendant has established a reasonable probability that, but for counsel's errors, the outcome of the trial would have been different. Strickland, 466 U.S. at 694-95, 104 S.Ct. at 2067-68. In making this judgment, a trial court's pretrial determination of prejudice has little or no value, because when such a finding is made, the judge has not heard any evidence and is examining the potential effect of the evidence in isolation.
 
 
 60
 I believe that the majority applies the wrong standard of prejudice. The majority finds that without Edna's second taped statement the evidence in this case is open to several interpretations, some leading to a conviction of first-degree murder and some to a conviction of second-degree murder. See majority opinion supra p. 1084. Because it believes that the untainted evidence supports a variety of inferences, the majority concludes that Edna's statement was prejudicial to Bolander. Id. Even in the light of Edna's second taped statement, however, the evidence presented at Bolander's trial is subject to multiple interpretations. If to establish prejudice defendants must show only that the evidence presented at trial is open to a variety of inferences, then many defendants could easily meet the prejudice requirement. Often times the evidence at trial will support different interpretations, some more probable than others.
 
 
 61
 The proper question is not whether Bolander has shown that the evidence is open to different interpretations; instead, the appropriate question is whether Bolander has shown that there is a reasonable probability that, absent the admission of Edna Stiles's second taped statement, the jury would have interpreted the evidence differently and convicted him of second-degree murder instead of first-degree murder. Strickland, 466 U.S. at 694-95, 104 S.Ct. at 2067-68. After reviewing the entire transcript of the trial, I agree with the state that the district court undervalued the strength of the circumstantial evidence. When all of the evidence is viewed together, I am confident that without Edna's second statement the jury still would have found premeditation and convicted Bolander of first-degree murder.
 
 
 62
 All of the following facts support a finding of premeditation. First, Bolander came to the Stiles home armed with the four-inch folding buck knife that he used to stab Orval Stiles. This knife was a dangerous weapon, and as such, Bolander's use of it could be considered by the jury as evidence of premeditation. See State v. Poyner, 306 N.W.2d 716, 718 (Iowa 1981) (holding that the use of a five-inch knife creates an inference of premeditation); Jury Instruction No. 24. Second, Bolander carried the knife in a folded position. Premeditation can be inferred from the fact that prior to the stabbing the knife had to be opened and the blade locked in place by pushing a button. See State v. Jespersen, 360 N.W.2d 804, 807 & n. 1. (Iowa 1985) (holding that the "use of a [dangerous] weapon, if accompanied by an opportunity to deliberate, even for only a short time, is evidence from which a trier of fact may find malice, deliberation, premeditation, and specific intent to kill"). Third, the nature of Orval Stiles's wounds provides evidence of a premeditated intent to kill. The fact that Bolander inflicted stab wounds sufficiently forceful to penetrate Orval Stiles's heart and expose his intestines is powerful evidence that Bolander premeditated about killing Orval Stiles and intended to kill him. See id. (holding that the type of wounds inflicted upon the victim can show that the wounds were intentionally inflicted); Poyner, 306 N.W.2d at 718 (same). Fourth, the table knife Orval used to wedge shut his bedroom door had been bent, indicating that the door to the bedroom had been forced open. This fact evidences that Bolander aggressively executed a premeditated attack. Fifth, Bolander at some point stopped using the plunger handle, which was bloody, and began using his knife to stab Orval. Bolander's change in his choice of weapons is further evidence that he premeditated about stabbing Orval. Last, that Edna's hands were bound when the police arrived is evidence of a plan by Bolander, and thus of premeditation. See State v. Freie, 335 N.W.2d 169, 172 (Iowa 1983) (holding that evidence of planning directed toward the killing is evidence of premeditation). Bolander offered no convincing explanation for why he bound Edna's hands with the towel. In his initial statement to the police, Bolander claimed that he had tied her up with the intent to rob her and that Orval Stiles then approached him. At trial, however, Bolander asserted that he and Edna were kissing when he heard a noise and that he was confronted by Orval when he went to investigate the noise. This version of his story is contradicted by the fact that Edna's hands were tied when the police arrived. When questioned on cross-examination about this inconsistency, Bolander answered that he did not remember tying up Edna, but that he may have done so.
 
 
 63
 When all the factors surveyed above are examined in the aggregate, I am confident that the jury would have found premeditation without Edna's second taped statement. Bolander has not shown a reasonable probability that, absent the statement, the jury would have found him guilty of second-degree murder rather than first-degree murder.
 
 
 64
 Accordingly, I dissent.
 
 
 
 [1]
 The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa