*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

**UNITED STATES**
Appellee

**v.**

**Raiden J. ANDREWS,**
**Quartermaster Seaman Apprentice**
United States Navy, Appellant

**No. 17-0480**
Crim. App. No. 201600208

Argued February 28, 2018—Decided May 22, 2018

Military Judge: Heather D. Partridge

For Appellant: *Lieutenant Commander Jacob E. Meusch,* JAGC, USN (argued); *Rebecca Snyder,* Esq.

For Appellee: *Captain Sean M. Monks,* USMC (argued); *Colonel Valerie C. Danyluk*, USMC, *Major Kelli A. O'Neil,* USMC, and *Brian K. Keller,* Esq. (on brief).

Judge SPARKS delivered the opinion of the Court, in which Chief Judge STUCKY, and Judges RYAN, OHLSON, and MAGGS, joined.

————————

Judge SPARKS delivered the opinion of the Court.

A panel with enlisted representation sitting as a general court-martial convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012). The panel acquitted Appellant of two other specifications of sexual assault. Appellant was also convicted, pursuant to his pleas, of unauthorized absence, fleeing from apprehension, false official statement, use of marijuana, and larceny in violation of Articles 86, 95, 107, 112a, and 121, UCMJ, 10 U.S.C. §§ 886, 895, 907, 912a, 921 (2012).

The members sentenced Appellant to reduction to E-1, thirty-six months of confinement, forfeitures of $1,616.00 per month for thirty-six months, and a dishonorable discharge. The convening authority changed the forfeiture

amount to $1,566.90,[1] but approved the rest of the sentence as adjudged. The United States Navy-Marine Corps Court of Criminal Appeals affirmed the findings and sentence, holding portions of trial counsel's final argument contained severe, but non-prejudicial prosecutorial misconduct. *United States v. Andrews*, No. NMCCA 201600208, 2017 CCA LEXIS 283, at *31, 2017 WL 1506072, at *13 (N-M. Ct. Crim. App. Apr. 27, 2017). We granted review to determine whether the lower court erred.[2]

In its brief, the Government argued the lower court erred when it applied our precedent to review prosecutorial misconduct for plain error, contending the lower court should have held Appellant waived appellate review of prosecutorial misconduct when his defense counsel failed to object at trial.

We hold: (1) the lower court was correct to review for plain error, and (2) trial counsel's statements amounted to plain, obvious error, but there was no material prejudice to Appellant's substantial rights.

**Background**

In May 2014, Appellant attended a party hosted by Petty Officer (PO) Eric Krueger and his then wife, Rose Wade. PO Jake Hills, PO Alejandro Garcia, PO Joshua Jones, his wife—Sarah Garza—and AB—Ms. Wade's civilian friend—also attended the party.

The party began with drinks at the beach, where AB drank two Mike's Hard Lemonades. Appellant told Naval Criminal Investigative Service (NCIS) he and PO Krueger joked about Appellant potentially "get[ting] lucky with AB." PO Krueger, however, testified he told Appellant not to "hook up" with AB after Appellant asked about sleeping

---

[1] A sentence forfeiture must "state the exact amount in whole dollars to be forfeited." Rule for Courts-Martial (R.C.M.) 1003(b)(2). This aspect of the sentence should be corrected to a whole dollar amount.

[2] The specific granted issue is, "The lower court found severe prosecutorial misconduct. Then it affirmed the findings and sentence, giving its imprimatur to the prosecutorial misconduct in Appellant's case. Did the lower court err?"

with her. PO Krueger told Appellant AB had recently had sex with PO Hills.

The party moved to PO Krueger's house. AB testified she arrived at the house with both her own alcohol and a change of clothing, intending to sleep over. PO Krueger and Ms. Wade testified AB arrived with ingredients to prepare mixed drinks. They both testified AB drank her prepared mixed drinks all night. AB, however, never reported drinking any mixed drinks. She told NCIS she had eight drinks on the night of the party, but testified at trial that she had about fifteen drinks, including Redd's Apple Ale, beer, and more Mike's Hard Lemonade. Ms. Wade testified AB drank three quarters of a two-liter bottle of the mixed drinks AB reportedly brought to the party, and said she had never seen AB so drunk. She said AB was "[p]retty intoxicated.… stumbling, slurring words, [and was] trying to use the wall to stand up." PO Krueger testified AB was drinking beers, had "more than three" of her mixed drinks, and was getting "drunk pretty fast." Ms. Garza described AB as "trashed," said she was stumbling, had poor balance, and was not responsive. PO Jones testified AB appeared intoxicated, was slurring her speech and swaying back and forth, and did not seem sober. He said AB appeared to become more intoxicated as the night wore on and, by midnight, AB was slouched on the couch and was barely coherent. By the end of the night AB felt "very numb," could not feel her limbs, and had to crawl against the wall to support herself.

Appellant and AB had only three brief interactions before the party ended, one of which involved Appellant asking AB whether she was going to finish her drink.[3] PO Krueger witnessed at least one of these interactions and described AB as "standoffish."

Appellant watched Ms. Wade help AB to her spare bedroom to sleep, and told NCIS AB was drunk when she went to bed. Once in the spare room AB undressed to her underwear and a tank top, plugged her phone in, got into bed, and then immediately "pass[ed] out." Ms. Wade left the room once she believed AB was asleep.

---

[3] Rather than responding orally, AB finished her drink.

The party ended around 12:30 a.m. PO Krueger told Appellant not to sleep in the spare room—with AB—after Appellant asked if he could. When Ms. Wade saw Appellant try to enter the spare bedroom she said "[d]o not go in there … you are on the couch." After seeing Appellant get on the couch and cover himself with blankets, Ms. Wade retreated to her own bedroom.

Appellant and AB offered drastically different accounts of what happened next. AB testified she awoke to pressure on her hips and upper thighs. She said she was "startled … awake" by the weight, could see from the light outside someone was on top of her, and realized immediately it was Appellant. AB said she yelled stop three times, pushed Appellant off of her, and then passed out again. AB testified she was unsure whether Appellant penetrated her vulva with his penis, but denied consenting to any sexual activity with Appellant and said she would not have consented had she been awake.

Appellant told NCIS he entered the spare room hoping to "get lucky" and became sexually aroused at the thought of having sex with AB. Appellant said he and AB lay in bed together for ten to fifteen minutes—neither kissing nor having any physical interaction—before they began having sex. Appellant initially told NCIS AB was awake when he entered the spare room and said she vomited before orally consenting to having sex and undressing herself.[4] He told NCIS he "didn't care" AB had just vomited. Appellant said AB was responsive during their intercourse and moaned and scratched his back.[5] Appellant said AB touched his hair and then told him to stop, at which point he immediately complied.

Around 4:00 a.m., AB fled the spare room and awoke PO

---

[4] Appellant maintained his assertion that AB was awake when he entered the room both during a wired conversation with PO Krueger and throughout most of his NCIS interrogation. After NCIS pressed Appellant, he admitted it was possible AB was asleep or passed out.

[5] PO Krueger corroborated the presence of scratches on Appellant's back.

Krueger and Ms. Wade. Both PO Krueger and Ms. Wade testified AB was crying and said she had been assaulted. AB threw up again before falling back asleep in Ms. Wade's room.

## Discussion

### I. Prosecutorial Misconduct
### A. The Proper Standard of Review

The following is well established in our case law. We review prosecutorial misconduct and improper argument de novo. *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017). If proper objection is made, we review for prejudicial error. *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citing Article 59, UCMJ, 10 U.S.C. § 859 (2000)). If no objection is made, we hold the appellant has forfeited his right to appeal and review for plain error.[6] *Id.*; *Sewell*, 76 M.J. at 18. The burden of proof under plain error review is on the appellant. *Sewell*, 76 M.J. at 18.

The Government relies on *United States v. Ahern*, 76 M.J. 194 (C.A.A.F. 2017), to argue we should depart from precedent and interpret R.C.M. 919(c) to say a defense counsel's mere failure to timely object to improper argument constitutes waiver. The Government's position is consistent with a series of Army Court of Criminal Appeals' decisions holding that R.C.M. 919(c) is a waiver provision. *See, e.g.*, *United States v. Kelly*, 76 M.J. 793 (A. Ct. Crim. App. 2017); *United States v. Sanchez*, No. ARMY 20140735, 2017 CCA LEXIS 470, 2017 WL 3037442 (A. Ct. Crim. App. July 17, 2017); *United States v. Burris*, No. ARMY 20150047, 2017 CCA LEXIS 315, 2017 WL 1946326 (A. Ct. Crim. App. May 8, 2017); *United States v. Marcum*, No. ARMY 20150500, 2017 CCA LEXIS 312, 2017 WL 1857232 (A. Ct. Crim. App. May 5, 2017).[7]

---

[6] We first considered R.C.M. 919(c) a forfeiture provision in *United States v. Burks*, in which we conflated the terms "waiver" and "plain error." 36 M.J. 447, 452 n.3 (C.M.A. 1993).

[7] In *United States v. Motsenbocker*, the United States Navy-Marine Corps Court of Criminal Appeals abided by our precedent and applied forfeiture to un-objected to prosecutorial misconduct. No. NMCCA 201600285, 2017 CCA LEXIS 539, 2017 WL 4640030

"Deviation from a legal rule is 'error' unless the rule has been waived." *United States v. Girouard*, 70 M.J. 5, 10 (C.A.A.F. 2011) (internal quotation marks omitted) (citation omitted). "While this Court reviews forfeited issues for plain error, we do not review waived issues because a valid waiver leaves no error to correct on appeal." *Ahern*, 76 M.J. at 197 (citations omitted).

Affirming the lower court's application of waiver would require us to overturn *Fletcher* and its progeny. Under the doctrine of stare decisis, we decline to do so.

> Stare decisis is defined as [t]he doctrine of precedent, under which a court must follow earlier judicial decisions when the same points arise again in litigation. The doctrine encompasses at least two distinct concepts … : (1) "an appellate court[] must adhere to its own prior decisions, unless it finds compelling reasons to overrule itself" (horizontal stare decisis); and (2) courts "must strictly follow the decisions handed down by higher courts" (vertical stare decisis).

*United States v. Quick*, 74 M.J. 332, 343 (C.A.A.F. 2015) (Stucky, J., joined by Ohlson, J., dissenting) (brackets in original) (citations omitted).

"[A]dherence to precedent is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *United States v. Blanks*, 77 M.J. 239, 242 (C.A.A.F. 2018) (internal quotation marks omitted) (quoting *United States v. Sills*, 56 M.J. 239, 241 (C.A.A.F. 2002) (per curiam)). We will not overturn "precedent … [that] has been treated as authoritative for a long time …. unless the most cogent reasons and inescapable logic require it." 20 Am. Jur. 2d *Courts* § 127, Westlaw (database updated May 2018) (footnotes omitted). Stare decisis is "most compelling where courts undertake

_____

(N-M. Ct. Crim. App. Oct. 17, 2017). The *Motsenbocker* court followed the correct approach. *See United States v. Davis*, 76 M.J. 224, 228 n.2 (C.A.A.F. 2017) (explaining "the services courts of criminal appeals must adhere to this Court's precedent even when they believe that subsequent decisions call earlier decisions into question" (citation omitted)).

statutory construction," as we are here. *United States v. Rorie*, 58 M.J. 399, 406 (C.A.A.F. 2003) (citations omitted). The party requesting that we overturn precedent bears "a substantial burden of persuasion." 20 Am. Jur. 2d*, supra,* § 127.

Applying stare decisis is, however, "not an inexorable command." *Blanks*, 77 M.J. at 242 (internal quotation marks omitted) (quoting *United States v. Falcon*, 65 M.J. 386, 390 (C.A.A.F. 2008)). We are not bound by precedent where "there has been a significant change in circumstances after the adoption of a legal rule, or an error in legal analysis," and we are "willing to depart from precedent when it is necessary to vindicate plain, obvious principles of law and remedy continued injustice." 20 Am. Jur. 2d, *supra,* § 127.

"We consider the following factors in evaluating the application of stare decisis: whether the prior decision is unworkable or poorly reasoned; any intervening events; the reasonable expectations of servicemembers; and the risk of undermining public confidence in the law." *Blanks*, 77 M.J. at 242 (internal quotation marks omitted) (citation omitted). Even if these factors weigh in favor of overturning long-settled precedent, "we [still] require 'special justification,' not just an argument that the precedent was wrongly decided." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014); *see also Dickerson v. United States*, 530 U.S. 428, 443 (2000); *Blanks*, 77 M.J. at 242 (citations omitted); Kurt T. Lash, *The Cost of Judicial Error: Stare Decisis and the Role of Normative Theory*, 89 Notre Dame L. Rev. 2189, 2189 (2014) ("The prudential doctrine of stare decisis is meant to ameliorate these costs by counseling judicial adherence to precedent *even in those cases where a judge believes the prior decision was wrong*." (emphasis added) (citation omitted)).

Applying each of these factors to R.C.M. 919(c) and considering general stare decisis jurisprudence, we are compelled to uphold *Fletcher* and to continue to review un-objected to prosecutorial misconduct and improper argument for plain error.

## 1. Whether *Fletcher* is unworkable or poorly reasoned

"Under the doctrine of *stare decisis*, the question is not

whether the interpretation [at issue] is plausible; it is whether the … decision is so unworkable or poorly reasoned that it should be overruled." *United States v. Tualla*, 52 M.J. 228, 231 (C.A.A.F. 2000). In *Fletcher*, we applied forfeiture to review un-objected to prosecutorial misconduct for plain error, notwithstanding the R.C.M. 919(c) language that, "Failure to object to improper argument before the military judge begins to instruct the members on findings shall constitute *waiver* of the objection." 62 M.J. at 179 (emphasis added); R.C.M. 919(c) (emphasis added). "[C]ourts must give effect to the clear meaning of statutes as written" and questions of statutory interpretation should "begin and end … with [statutory] text, giving each word its ordinary, contemporary, and common meaning." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017) (internal quotation marks omitted) (citations omitted); *see also United States v. Schell*, 72 M.J. 339, 343 (C.A.A.F. 2013) ("Unless the text of a statute is ambiguous, the plain language of a statute will control unless it leads to an absurd result." (internal quotation marks omitted) (citation omitted)). Thus, "[a]s a first step in statutory construction, we are obligated to engage in a 'plain language' analysis of the relevant statute," *United States v. Tucker*, 76 M.J. 257, 258 (C.A.A.F. 2017), and to "apply the common and ordinary understanding of the words in the statute." *United States v. Phillips*, 70 M.J. 161, 165 (C.A.A.F. 2011).[8] Without question, R.C.M. 919(c) says "waiver" and does not mention "forfeiture."

We are, however, not convinced this acknowledgment requires us to overturn any case law. Although the United States Supreme Court has "from time to time … overruled governing decisions that are unworkable or are badly reasoned, [it has] rarely done so on grounds not advanced by the parties" and has declined to do so where the petitioning party has failed to establish unworkability. *United States v. International Business Machines Corp.*, 517 U.S. 843, 856 (1996) (internal quotation marks omitted) (citations

---

[8] We apply these principles when we interpret the rules and other provisions in the *Manual for Courts-Martial, United States (MCM)* as well.

omitted). The Government has only argued *Fletcher* ignored R.C.M. 919(c)'s plain language and has neither established that *Fletcher* is now unworkable nor has it advanced any argument to that effect.[9] We decline to make this argument for the Government, and in any case, we find the majority of the remaining factors weigh in favor of applying stare decisis to uphold *Fletcher*.

## 2. Any intervening events

When a court is "clearly convinced that [precedent] … is no longer sound because of changing conditions and that more good than harm will come by departing from precedent, [the Court is] not inexorably bound by [its] own precedents." *State v. Mauchley*, 67 P.3d 477, 481 (Utah 2003) (first alteration in original) (internal quotation marks omitted) (citation omitted). The Government argues our decision in *Ahern* constitutes a change requiring departure from precedent. *Ahern* is distinguishable from this case in the following respects. First, while this case concerns R.C.M. 919(c), *Ahern* involved Military Rule of Evidence 304. 76 M.J. at 197. Second, issues relating to closing arguments are altogether different from the evidentiary issue in *Ahern* that arose during the pretrial stage, when defense counsel had ample opportunity to object. *Id.* at 195–98. Third, while Appellant's counsel failed to object here, Ahern's defense counsel repeatedly affirmatively waived objection to the

---

**9** While *Fletcher's* application of forfeiture remains workable, applying waiver instead of forfeiture would render much of *Fletcher's* prejudice analysis unworkable where, as here, defense counsel objected to some misconduct. In *Fletcher*, we applied three factors to determine whether prosecutorial misconduct was prejudicial, the first of which was the severity of the misconduct. 62 M.J. at 184. To determine how severe the misconduct was, we applied five more factors, including "(1) the raw numbers—the instances of misconduct as compared to the overall length of the argument, [and] (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole." *Id.* Were we to hold Appellant waived the misconduct his counsel did not object to, we would have to review the one instance of objected-to misconduct in a vacuum. To do so would be unjust and illogical, as it would result in an inaccurate evaluation of the prejudicial effect of trial counsel's arguments.

evidence at issue. *Id.* at 196–98. Consequently*, Ahern* by itself is not the type of changed condition or intervening event necessitating a departure from precedent. *Cf. United States v. Boyett*, 42 M.J. 150, 155 (C.A.A.F. 1995) (explaining "significant changes in the structure and organization of the armed forces" and changes in military regulations warranted a departure from precedent); *Mauchley*, 67 P.3d at 481–86 (deciding an old evidentiary rule should be overturned where "the federal courts and a growing number of state courts" had adopted a new rule). Thus far, there have been no changes in regulation, rule, or military structure necessitating the application of waiver in this case.[10]

### 3. The reasonable expectations of servicemembers

We concede servicemembers have not relied on *Fletcher* in any way that would compel us to continue to interpret R.C.M. 919(c) as a forfeiture provision.

### 4. The risk of undermining public confidence in the law

Just as overturning precedent can undermine confidence in the military justice system, upholding precedent tends to bolster servicemembers' confidence in the law. *See* Henry Paul Monaghan, *Stare Decisis and Constitutional Adjudication*, 88 Colum. L. Rev. 723, 753 (1988) ("If courts are viewed as unbound by precedent, and the law as no more than what the last Court said, considerable efforts would be expended to get control of such an institution—with judicial independence and public confidence greatly weakened."). This is especially true where, as here, the precedent involves appellate review of prosecutorial misconduct—an issue that may, on its own, undermine confidence in the military justice system. *See United States v. Olsen*, 737 F.3d 625, 632

---

[10] There has, however, been a change to the military justice system weighing in favor of upholding *Fletcher*. Effective January 1, 2019, R.C.M. 919(c) will read "Failure to object to improper argument before the military judge begins to instruct the members on findings shall constitute *forfeiture* of the objection." Exec. Order No. 13,825, 83 Fed. Reg. 9889 (Mar. 8, 2018) (emphasis added). While this modification has no direct impact on this case, it would be frivolous to overturn fifteen years of precedent for an eight-month period.

(9th Cir. 2013) (order denying petition for rehearing en banc) (Kozinski, C.J., joined by Pregerson, J., Reinhardt, J., Thomas, J.; Watford, J., dissenting) (explaining prosecutorial misconduct "erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law").

### 5. Whether any special justification weighs in favor of overturning *Fletcher*

Finally, the Government advances no "special justification" requiring us to depart from precedent, nor can we conceive of one. Overturning *Fletcher* to hold un-objected to improper argument must be waived absent a special justification would allow this form of prosecutorial misconduct to persist, largely unchecked, and would thus risk egregious harm to our justice system. *Cf. Payne v. Tennessee*, 501 U.S. 808, 834 (1991) (Scalia, J., joined as to Part II by O'Connor, J., and Kennedy, J., concurring) (arguing a special justification should *not* be required to overturn precedent that "significantly harms our criminal justice system and is egregiously wrong") (emphasis added)).

In any case, given that the Government failed to provide a special justification or advance any argument beyond *Fletcher* wrongly interpreting R.C.M. 919(c), and that four of the five above factors weigh in favor of upholding *Fletcher*, we conclude that Appellant forfeited his challenge to trial counsel's improper argument.

### B. Plain Error

"Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Fletcher*, 62 M.J. at 179 (citations omitted).

Appellant's defense counsel only objected to one instance of misconduct. Technically we review that instance of misconduct as preserved error, while we review the remainder of the asserted improper argument for plain error. Both standards, however, culminate with an analysis of whether there was prejudicial error. *See Sewell*, 76 M.J. at 18 ("In either case, reversal is warranted only 'when the trial counsel's comments taken as a whole were so damaging that we cannot be confident that the members convicted the

appellant on the basis of the evidence alone.'" (quoting *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014))).

"Trial prosecutorial misconduct is behavior by the prosecuting attorney that 'oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *Fletcher*, 62 M.J. at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citation omitted). Prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger*, 295 U.S. at 88. "While prosecutorial misconduct does not automatically require a new trial or the dismissal of the charges against the accused, relief will be granted if the trial counsel's misconduct 'actually impacted on a substantial right of an accused (*i.e.*, resulted in prejudice).'" *Fletcher*, 62 M.J. at 178 (quoting *Meek*, 44 M.J. at 5).

At Appellant's court-martial, trial counsel advanced a theory of the case revolving around the idea Appellant was a scheming liar who went into AB's room on the night of the party hoping she would mistake him for PO Hills and unwittingly consent to having sex with him. Appellant now contends portions of trial counsel's argument amounted to prejudicial prosecutorial misconduct. Appellant specifically complains trial counsel:

1. Repeatedly and consistently made inflammatory and disparaging statements, from calling Appellant a liar more than twenty-five times to referring to him as "Don Juan";

2. Accused defense counsel of not believing Appellant's version of events;

3. Misstated the law when he analogized consenting to sex to enlisting in the Navy or having plastic surgery; and

4. Thrice quoted or referred to a wholly fabricated admission.

Before determining whether Appellant was prejudiced, we must ask whether trial counsel's arguments amounted to plain or obvious error—or whether they were improper arguments—in the first place. *See Fletcher*, 62 M.J. at 179–84 (analyzing whether each instance of alleged misconduct was error). Rather than engage in a long and searching analysis of whether each complained-of statement was an improper argument, we adopt the lower court's conclusion that the prosecutorial misconduct in this case amounted to plain and obvious error. *Andrews*, 2017 CCA LEXIS 283, at *16–23, *26–27, 2017 WL 1506072, at *7–9, *11.

## II. Prejudice

"[I]t is not the number of legal norms violated but the impact of those violations on the trial which determines the appropriate remedy for prosecutorial misconduct." *Meek*, 44 M.J. at 6. "In assessing prejudice, we look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." *Fletcher*, 62 M.J. at 184 (citation omitted). We weigh three factors to determine whether trial counsel's improper arguments were prejudicial: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Id.* "[T]he third factor [alone] may so clearly favor the government that the appellant cannot demonstrate prejudice." *Sewell*, 76 M.J. at 18. Again, we agree with the lower court that there was severe prosecutorial misconduct, and we too conclude the weight of the evidence favors the Government such that Appellant cannot establish prejudice.

In *Fletcher*, we applied five factors to determine how severe the prosecutorial misconduct was. 62 M.J. at 184. Applying those factors to the instant case, we find trial counsel's misconduct was severe because: (1) it occurred with alarming frequency; (2) it persisted throughout the entirety of trial counsel's closing argument, including through the rebuttal; (3) the entire trial was five days long and the trial on the merits lasted for only three days; (4) the panel deliberated for less than three hours before convicting Appellant; and (5) the military judge issued just one ruling for trial counsel to abide by and trial counsel failed to do so. All five factors indicate the misconduct was severe.

Next, the military judge's failure to offer any specific, timely curative instructions also weighs in favor of finding prejudice. When defense counsel requested an instruction as an alternative to moving for a mistrial, the military judge seemed to agree there was error, but declined to take any curative action. The only instructions she gave were standard Military Judges' Benchbook instructions and were given after the close of trial, before deliberation.

Although the first two factors weigh in Appellant's favor, the evidence "so clearly favor[s] the government that [Appellant] cannot demonstrate prejudice." *Sewell*, 76 M.J. at 18. In *Hornback*, we held the third factor was dispositive where two witnesses testified they watched the appellant commit the crime charged. 73 M.J. at 161. In *Sewell*, we held the third factor to be dispositive where the appellant admitted to being at the scene of the crime in "compromising circumstances." 76 M.J. at 19. In this case, as in *Hornback* and *Sewell*, there were multiple corroborating witnesses and Appellant admitted to being at the party in bed with AB.

To have convicted Appellant of sexual assault under Article 120(b)(3), UCMJ, the panel must have found: (1) Appellant committed a sexual act upon AB by penetrating her vulva with his penis while (2) AB was too intoxicated to consent, and (3) Appellant "knew *or reasonably should have known"* AB was too intoxicated to consent. *MCM* pt. IV, para. 45.b.(3)(f) (2016 ed.) (emphasis added).

Regardless of trial counsel's improper arguments, there was ample evidence in support of all three elements. First, during his recorded interrogation, Appellant told NCIS he had sex with AB and discussed the intercourse with PO Krueger while PO Krueger was wearing a wire for NCIS. Defense counsel also conceded as much at trial when he argued that AB consented to the sex because she thought Appellant was PO Hills. Second, there was no dispute at trial that AB was drinking and was intoxicated. Although there was some discrepancy as to what and exactly how much AB drank, she, along with almost every other party attendee, testified she was drinking heavily and consistently all night, and Appellant told NCIS AB was drunk. There was compelling evidence, in addition to the sheer amount of liquor AB consumed, that she was too drunk to be capable of

consent. Namely, AB was so drunk she lost consciousness, could not physically support herself, lost feeling in her limbs, and vomited at least twice. Finally, Appellant either knew or, at least *reasonably should have known*, AB was incapable of consenting. Everyone else at the party knew AB was extremely intoxicated—they described her as "trashed" and "incoherent," and said she was slurring her words and could not stand up. Appellant was at the party with AB all day. He watched Ms. Wade help AB to the spare room. He ignored PO Krueger and Ms. Wade's instructions not to enter the spare bedroom. He lay next to AB for fifteen minutes before they had intercourse, during which time AB was largely if not wholly unresponsive. He watched AB vomit in the bed before they had sex. Appellant met AB on the day of the assault and they barely interacted at the party. Appellant had every reason to suspect AB was too intoxicated to consent and no reason to believe AB would knowingly consent to having sex with him.

Accordingly, we conclude the evidence against Appellant was so strong we are "confident that the members convicted the appellant on the basis of the evidence alone." *Fletcher*, 62 M.J. at 184. There was, therefore, no prejudice to Appellant's substantial rights.

Despite our finding of no prejudice, the prosecutorial conduct in this case raises concerns we feel compelled to address. We remind all military judges of their "*sua sponte* duty to insure [sic] that an accused receives a fair trial." *United States v. Watt*, 50 M.J. 102, 105 (C.A.A.F. 1999) (internal quotation marks omitted) (citation omitted); *see also United States v. Knickerbocker*, 2 M.J. 128, 129 (C.M.A. 1977) ("At the very least, the judge should have interrupted the trial counsel before he ran the full course of his impermissible argument."). Military judges are neither "mere figurehead[s]" nor are they "umpire[s] in a contest between the Government and accused." *Watt*, 50 M.J. at 105 (internal quotation marks omitted) (quoting *United States v. Kimble*, 23 C.M.A. 251, 253, 49 C.M.R. 384, 386 (1974)). Nor can a defense counsel sit like a bump on a log—he or she owes a duty to the client to object to improper arguments early and often. *See DeFreitas v. State*, 701 So.2d 593, 602 (Fla. Dist. Ct. App. 1997) (explaining the court is unlikely to

"excuse counsel for his failure" to object because a defense counsel "has the duty to remain alert to such things in fulfilling his responsibility to see that his client receives a fair trial"). Failure to do so may give rise to meritorious ineffective assistance of counsel claims. *See* F. Emmit Fitzpatrick & NiaLena Caravasos, *Ineffective Assistance of Counsel*, 4 Rich. J.L. & Pub. Int., 67, 81 (2000) (listing federal cases in which the circuit courts found ineffective assistance of counsel for failure to object (citing *Williams v. Washington*, 59 F.3d 673, 684 (7th Cir. 1995); *Henry v. Scully*, 78 F.3d 51, 52–53 (2d Cir. 1996); *Bolander v. Iowa*, 978 F.2d 1079, 1083–84 (8th Cir. 1992); *Crotts v. Smith*, 73 F.3d 861, 867 (9th Cir. 1996); *Atkins v. Attorney General of Alabama*, 932 F.2d 1430, 1432 (11th Cir. 1991); and *Mason v. Scully*, 16 F.3d 38, 45 (2d Cir. 1994))). Finally, we remind trial counsel they are:

> representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, [they are] in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer…. It is as much [their] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger*, 295 U.S. at 88. Every attorney in a court-martial has a duty to uphold the integrity of the military justice system.

## Judgment

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed as to the findings and only so much of the sentence as provides for confinement for thirty-six months, reduction to pay grade E-1, forfeiture of $1,566.00 pay per month for thirty-six months, and a dishonorable discharge.